[No. B224601. Second Dist., Div. Four. Nov. 17, 2011.]

BARRY WALLMAN et al., Plaintiffs and Appellants, v.
BENJAMIN SUDDOCK et al., Defendants and Respondents.

COUNSEL

Radcliff & Saiki and Eric Saiki for Plaintiffs and Appellants.

Gilbert, Kelly, Crowley & Jennett, Timothy W. Kenna and Karen E. Jung for Defendant and Respondent Benjamin Suddock.

Selman Breitman, Neil Selman and Rachel E. Hobbs for Defendant and Respondent American Guarantee and Liability Insurance Company.

OPINION

**SUZUKAWA, J.**—Plaintiffs/appellants appeal the denial of their motions for summary judgment and the grant of defendants/respondents' motions for summary judgment. We conclude that defendants were entitled to summary judgment, and thus we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiffs Barry Wallman, Stan Wallman, and Nancy Wallman (the Wallmans) are general partners of plaintiff Sea Val Enterprises, a general partnership that

owns interests in real property. Former plaintiff RTG Investments, Inc. (RTG), is a California corporation, of which Barry Wallman is a principal. Dan Wallman, not a party to this action, is Barry Wallman's brother and Stan Wallman's son.

Defendant American Guarantee and Liability Insurance Company (American Guarantee) is an insurance company that insured apartment buildings owned by some of the plaintiffs. Defendant Benjamin Suddock, doing business as Suddock Insurance Agency (Suddock), is an insurance agent who procured the American Guarantee policies.

## I. Underlying Facts

### A. The Ingraham Property

In 1994, the Wallmans owned an apartment building at 1325 Ingraham Street in Los Angeles (the Ingraham property). From December 4, 1993, to December 4, 1994, the Ingraham property was insured by Crusader Insurance Company (Crusader). The Crusader policy provided bodily injury liability coverage of $500,000 per occurrence "arising out of the ownership, maintenance or use of the insured premises."

In February 1994, a child named Anthony Rodriguez fell from a third story window of the Ingraham property and suffered a serious head injury.

The Wallmans sold the Ingraham property in August 2001.

### B. The Formation of RTG

In 2004, some of the Wallmans formed RTG. RTG became the owner of at least 23 separate limited liability corporations (LLC's), each of which owned a piece of real property. None of the LLC's owned the Ingraham property.

### C. RTG's Acquisition of Business Owner's Liability Insurance Through Capital Insurance Group

In 2004, RTG retained Suddock to obtain primary insurance coverage for the 23 LLC's and the real property they owned. Suddock obtained business owner's liability coverage for the LLC's and properties through the Capital Insurance Group (Capital).

Capital issued separate policies to each LLC and its property for the policy period July 15, 2005, to July 15, 2006 (the Capital policies). The Capital policies provided coverage for, among other things, "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' [or] property damage . . . to which this insurance applies. . . . [¶] This insurance applies . . . [t]o 'bodily injury' and 'property damage' only if: [¶] (a) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and [¶] (b) The 'bodily injury' or 'property damage' occurs during the policy period." The limits of liability of the Capital policies were $1 million liability coverage per occurrence and $2 million "general aggregate."

### D. *RTG's Acquisition of Excess and Umbrella Coverage Through American Guarantee*

In 2004, RTG asked Suddock to obtain excess and umbrella coverage for its properties. Effective July 15, 2005, Suddock procured a commercial excess/umbrella liability policy from American Guarantee for named insured RTG Investments, Inc., for the policy period "07/15/05 to 07/15/06."

"Coverage A" ("Excess Follow Form Liability Insurance") of the American Guarantee policy provided:

"Under Coverage A, we will pay on behalf of the insured, those damages covered by this insurance in excess of the total applicable limits of underlying insurance. With respect to Coverage A, the terms and conditions of underlying insurance are made a part of this policy, except with respect to:

"1. Any contrary provision contained in this policy; or

"2. Any provision in this policy for which a similar provision is not contained in underlying insurance.

"With respect to the exceptions stated above, the provisions of this policy will apply.

"Notwithstanding anything to the contrary contained above, if underlying insurance does not apply to damages, for reasons other than exhaustion of applicable limits of insurance by payment of claims, then Coverage A does not apply to such damages."

Section II of the policy, "Limits of Insurance," provided in paragraph C: "Coverage A applies only in excess of the greater of the actual limits of insurance of underlying insurance or the limits of insurance shown on the Schedule of Underlying Insurance forming a part of this policy."

Section VI, paragraph (A)(9), "Maintenance of Underlying Insurance," provided: "During the period of this policy, you agree:

"a. To keep the policies listed in the Schedule of Underlying Insurance in full force and effect;

"b. That the Limits of Insurance of the policies listed in the Schedule of Underlying Insurance will be maintained except for any reduction or exhaustion of limits by payment of claims or suits for damages covered by underlying insurance;

"c. The policies listed in the Schedule of Underlying Insurance may not be canceled or not renewed by you without notifying us, and you agree to notify us in the event an insurance company cancels or declines to renew any policy listed in the Schedule of Underlying Insurance;

"d. Renewals or replacements of the policies listed in the Schedule of Underlying Insurance will not be materially changed without our agreement.

"If you fail to comply with these requirements, we will only be liable to the same extent that we would have been had you fully complied with these requirements."

The "Schedule of Underlying Insurance" identified the underlying primary insurance as follows:

"Company: Capital Insurance Group

"Policy No.: TBD

"Term: 07/15/05 to 07/15/06

"Coverage: Commercial General Liability

"Applicable Limits: $2,000,000 Each Occurrence"

Endorsement No. 2 identified 25 properties covered by the American Guarantee policy. The Ingraham property was not included on that endorsement.

On December 1, 2005, American Guarantee issued a further endorsement to the policy, effective July 15, 2005. The endorsement corrected the ZIP code of one of the properties and amended the Schedule of Underlying Insurance to reflect applicable limits of $1 million per occurrence.

### E. The Rodriguez Litigation

On April 4, 2006, Anthony Rodriguez, through his mother as guardian ad litem, sued Barry Wallman for the injuries he suffered when he fell from the window of the Ingraham property in February 1994. The Wallmans tendered the Rodriguez action to Crusader, which had provided primary insurance for the Ingraham property for the 1993–1994 policy year. Crusader accepted the tender and appointed counsel to defend the Wallmans.

When the Wallmans learned that the damages sought in the Rodriguez action might exceed the Crusader policy limits, they tendered the action to American Guarantee. American Guarantee denied coverage.

The Wallmans settled the Rodriguez litigation in May 2007 for $1 million. Crusader contributed its policy limits of $500,000, and Barry Wallman contributed the remaining $500,000.

## II. The Present Action

### A. Complaint

RTG and Barry Wallman filed the present action for negligence, breach of insurance contract, bad faith, and declaratory relief against defendants Benjamin Suddock, Suddock Insurance Agency (erroneously sued as Ben R. Suddock Insurance Services), and American Guarantee on June 29, 2007. Plaintiffs filed a first amended complaint on December 12, 2007, and a second amended complaint on April 1, 2008. Subsequently, plaintiffs dismissed RTG without prejudice and added Nancy Wallman, Stan Wallman, and Sea Val Enterprises as plaintiffs.

The second amended complaint, which is the operative complaint as to Suddock, and the third amended complaint, filed March 11, 2009, which is the operative complaint as to American Guarantee, allege that American Guarantee breached its insurance contract and acted in bad faith by denying coverage as to the Rodriguez action. They further allege that Suddock was

negligent in failing to procure excess coverage that would have protected plaintiffs against claims connected with previously owned properties, including the Ingraham property, and in assuring them that the American Guarantee policy would cover them for any claims arising out of their business.

B. *Suddock's Motion for Summary Judgment*

Suddock moved for summary judgment on October 24, 2008. He argued (1) because plaintiffs never requested coverage for previously owned buildings, he owed no duty to seek or recommend such coverage; (2) he met any applicable duty of care in procuring insurance coverage for plaintiffs; and (3) because there is no evidence that plaintiffs could have obtained coverage for previously owned buildings or prior years, plaintiffs could not show causation or damages.

In support of his motion for summary judgment, Suddock proffered the deposition of Barry Wallman, in which Barry testified that he never gave Suddock a list of properties his family no longer owned; he could not recall whether he provided Suddock with the name and address of the Ingraham property; he could not recall whether he told Suddock that he had owned the Ingraham property in the past; and he could not recall whether he told Suddock he wanted to insure properties his family no longer owned, "other than using the words 'make sure that we're covered for any possible lawsuit that could happen in the future.' " Suddock also proffered the deposition of Dan Wallman, in which Dan testified that no representations were made to him that the American Guarantee policy would cover prior years; he did not recall any direct request made by his firm to Suddock that the American Guarantee policy cover prior years; he does not know whether he believed that the American Guarantee policy would cover properties not listed in that policy; he does not recall whether he ever discussed the Ingraham property with Suddock; he does not believe he ever told Suddock that he wanted to insure the Ingraham property or other property his family no longer owned; and he never gave Suddock a list of properties his family no longer owned.

In opposition to summary judgment, plaintiffs submitted the declarations of Barry Wallman and Dan Wallman; each stated in pertinent part as follows:

"3. . . . Suddock held himself out to us as an expert in insurance matters, and specifically, for the type of risks our family encountered. He offered to act as our insurance consultant, advising us on our insurance needs. He represented to us at that time and after that [that] we needed higher liability limits than what we had previously purchased.

"4. Part of the reason for his suggestion that the limits should be increased and his suggestion of an umbrella policy in the 2001 timeframe is because we had discussed a significant claim that had been made against us in connection with one of our properties. Specifically, my brother . . . and I had multiple conversations with Suddock wherein we advised him in detail of the 'Park Avenue' claim, which was resolved in or about 2000.

"5. The Park Avenue claim was made against me and my family based on a partial collapse of an apartment building we owned in Los Angeles. Unfortunately, a tenant died in the collapse and a substantial wrongful death claim was made against me and my family as owners of the building. . . . We realized from the Park Avenue claim . . . that the $500,000 insurance limits that our prior broker had procured for us was woefully inadequate to respond to a significant claim arising from our business of owning apartment buildings, such as the wrongful death claim. Fortunately, the nature of the Park Avenue claim and the factual circumstances was such that multiple $500,000 policy periods applied to the claim (i.e., 'stacking' of limits) such that we were able to reach a structured, multi-million dollar settlement of the wrongful death claim.

"6. The Park Avenue claim taught us, however, that we needed higher insurance limits to adequately protect us should another substantial claim be made. We discussed these facts, and more, with Suddock. Thus, Suddock, at least as early as 2001, was aware of our need for greater insurance liability limits above our current limits and the nature of our risks. It was in this context that he recommended to us, and we discussed, umbrella insurance coverage. Suddock explained that he was experienced in this type of insurance and that he knew what our needs were given his understanding of our business and claim history. I believe that Suddock also understood through this process, as well as through our conversations, that my family and I were not sophisticated insurance buyers and that we were placing our reliance on his professional expertise in insurance.

"7. As part of the ongoing discussions with Suddock as to risk management and protection, Suddock was also aware of and counseled us on the strategy of separating each apartment building or property into a separate entity to shield unrelated properties from claims arising from other of our properties. As a result of our restructuring, Suddock helped us to procure primary insurance for each of the separate entities. Suddock was keenly aware of our risk management and protection strategies following the Park Avenue claim.

"8. In 2005, as part of our evolving risk management and risk protection efforts, Suddock advised us that he was able to procure umbrella coverage from American Guarantee & Liability Insurance Company ('AGLIC') with a

limit in the amount of $15 million. Pursuant to his suggestion and recommendation, we purchased the AGLIC umbrella/excess policy. We have since increased that limit to $25 million.

"9. In providing information to Suddock to obtain the umbrella coverage from AGLIC, we answered Suddock's questions and provided him with the information he requested. We were relying on Suddock's stated expertise and counsel as to what information was needed by the insurance carrier in order to provide us with the broadest protection of our business as was possible.

"10. At the time we first obtained the umbrella coverage from Suddock, both [my brother] and I asked Suddock whether he could imagine any claim that could be made against me and my family arising from our business for which we would not have protection under the umbrella policy. Suddock responded that he could not imagine any claim for which we would not have coverage. We relied on this statement, and thus, did not seek out any further protection in light of that statement."

The declaration of Barry Wallman additionally stated as follows: "20. As a result of the positions taken by [American Guarantee], I have sought out quotes for coverages that would more clearly provide coverage for claims arising from properties my family no long[er] owns. I have received quotes for coverages termed Incurred But Not Reported . . . which I understand will protect me from claims such as that which was made in the Rodriguez action. I also understand that there are other methods or insurance strategies by which to protect oneself from the claims asserted in connection with properties no longer owned or properties which were previously underinsured. I never previously investigated these alternatives prior to the Rodriguez Action because Suddock advised my family and me that he could not imagine any claim that came that would not be covered."

On the basis of these declarations, plaintiffs contended there were triable issues of material fact as to whether Suddock's conduct fell below the standard of care and caused them harm. Plaintiffs also contended there were triable issues of material fact as to whether Suddock assumed duties greater than those normally found in an agency relationship by holding himself out as an expert in insurance matters, assuring plaintiffs they had adequate insurance coverage, and misrepresenting the scope of the American Guarantee policy.

On February 4, 2009, the trial court granted Suddock's motion for summary judgment. The court noted there was no dispute that, as a general matter, a broker does not owe a duty to obtain coverage a client has not requested. Further, the parties agreed that when the Wallmans asked Suddock for a quote, they did not identify either the Ingraham property or any other

property they had previously owned. Finally, it was undisputed that it was plaintiffs' custom and practice in their prior dealings with Suddock to ask Suddock to remove from their insurance policies any buildings plaintiffs had sold. Thus, the court found that Suddock had satisfied his initial summary judgment burden with regard to the element of duty.

As to that element, the court said, the remaining question is "whether plaintiffs have proffered evidence creating a triable issue of fact . . . . It is undisputed that plaintiffs never inquired about, or requested insurance for[,] previously-owned properties or listed the Ingraham property on any schedule they provided Suddock. [Citation.]

"Plaintiff[s] attempt[] to create an issue of fact with citations to Paragraphs 2–7 of both Wallman Declarations. None of those paragraphs contradicts the fact in Paragraph 19, to wit, that 'the Wallman brothers never discussed, inquired or requested Suddock to look into or procure insurance for previously owned properties.' Indeed, it is uncontested that instead of inquiring into coverage for previously-owned buildings, plaintiffs' custom and practice was to request that Suddock remove properties that had been sold from any insurance policy. As noted above, it is also undisputed that plaintiffs never even informed Suddock of the existence of the Ingraham property.

"Plaintiffs try to create a triable issue of fact as to whether the Suddock defendants made misrepresentations as to the coverage they obtained for plaintiffs by referencing Mr. Suddock's statement that 'he could not imagine any claim for which we would not have coverage.' See Barry and Dan Wallman Declarations, at Paragraph 10. Plaintiffs, however, are mixing apples and oranges. There is no evidence that plaintiffs ever requested or referenced coverage for previously-owned buildings. All the discussions were directed at having sufficient policy limits on coverage for properties that plaintiffs . . . owned. No reasonable inference can be drawn from the admissible portions of the Wallman declarations that the reported discussions with Suddock were about coverage for previously owned businesses.

"As in *Fitzpatrick* [*v. Hayes* (1997) 57 Cal.App.4th 916 [67 Cal.Rptr.2d 445]], the Wallmans' 'conclusory statement[s]' that they relied on Suddock to advise them as to adequate coverage and Suddock's assurances regarding adequacy of coverage are insufficient to create a triable issue of fact as to duty where there was no evidence 'of any sort of inquiry from him to [the agent] much less specific advice in the opposite direction.'

"The only evidence plaintiffs cite to create a duty of care under a 'holding-out' theory are the Wallmans' conclusory assertions in Paragraph 3 of their respective declarations that 'Suddock held himself out as an expert in

insurance matters, and specifically, for the type of risks our family business encountered.' [Citation.] This conclusory and vague statement does not create any inference of 'holding out' in light of the uncontested evidence that plaintiffs expressly eschewed a desire for coverage for properties they no longer owned when their custom and practice was to request Suddock to remove those properties from policies procured by the Suddock defendants; indeed they never informed Suddock about the existence of the Ingraham property."

For all of these reasons, the court "grants summary judgment because there is no triable issue of fact as to the existence of a duty of care."

On February 11, 2010, the court ordered "that the motion for summary judgment is granted, and that judgment in favor of Defendants Benjamin Suddock, an individual and [doing business as] Suddock Insurance Agency, and against Plaintiffs RTG shall be entered accordingly, pursuant to Code of Civil Procedure Section 437c(c)." Suddock served notice of entry of judgment on March 25, 2010.

C. *American Guarantee's Motion and Plaintiffs' Cross-motion for Summary Judgment*

American Guarantee made a motion for summary judgment on October 30, 2008, and plaintiffs cross-moved for summary judgment on November 19, 2008. The trial court denied both motions.

On March 11, 2009, plaintiffs filed a third amended complaint.

In July and August 2009, plaintiffs and American Guarantee filed a second round of cross-motions for summary judgment on the causes of action against American Guarantee (breach of contract, bad faith, and declaratory relief).

The court initially denied both summary judgment motions pursuant to Code of Civil Procedure section 437c, subdivision (f)(2), which provides that a party may not move for summary judgment based on issues asserted in a prior motion unless the party establishes newly discovered facts or circumstances or a change of law. At oral argument, however, the court requested that the parties submit supplemental briefs addressing the court's jurisdiction to consider the summary judgment motions substantively. On November 3, 2009, the court determined that it would reconsider its prior summary judgment ruling and set a hearing to permit both sides to argue the merits.

On March 9, 2010, the court granted American Guarantee's summary judgment motion and denied plaintiffs'. Its order stated as follows:

"American Guarantee's policy provides excess coverage under Coverage A. Coverage A follows form with the policy identified in American Guarantee's Schedule of Underlying Insurance. It is true that the policy number for the policy identified on American Guarantee's Schedule of Underlying Insurance is followed by the term 'TBD' ('to be determined'). It is also true that the policy number is not specified. These observations do not create triable issues of material fact for the following reasons.

"1. The court finds as a matter of law that the Schedule of Underlying Insurance is not reasonably susceptible to an interpretation that the Underlying Insurance includes the Crusader policy. The Schedule unequivocally identifies 'Capital Ins. Gr.' as the 'Company' issuing that Underlying Insurance.

"2. Plaintiffs concede that 'Capital issued a separate policy to each LLC and its property' and that 'each policy contained the same business owners' liability coverage form, namely, BP 00 061292.' [Citations.] It is further undisputed that 'Form number BP 00 061292 provided coverage for injury or damage that occurred during the policy period and was caused by an "occurrence." ' [Citation.]

"3. Even though the policy number on the aforementioned Schedule of Underlying Insurance states 'TBD,' the following is undisputed regarding each Capital Ins. Gr. Policy: 'Although the various Capital policies were subject to the same policy form, they had different declarations pages. Each policy's declarations page referenced a different policy number and a different property as the Scheduled Premises. Coverage under each policy number was limited to the premises or project set forth on its respective Declarations page.' [Citations.]

"4. The 1994 accident in the *Rodriguez* case occurred outside the policy term set forth on the Schedule of Underlying Insurance in the American Guarantee policy, to wit, 7/15/05–07/15/06, and in the Capital policy. [Citation.]

"5. The 'Applicable Limits' on the Schedule of Underlying Insurance is $1,000,000 'Each occurrence.' It is undisputed that the amounts paid by Crusader and the defendants/Crusader insureds in the *Rodriguez* case did not exceed that 'Applicable Limit[].' Therefore, the American Guarantee policy has not been triggered with respect to the subject loss. [Citation.]

"6. The term for the Capital policy and American Guarantee excess policy is 7/15/05–7/15/06. [Citation.] The claims in the *Rodriguez* case would not be covered losses under the Capital policy. Therefore, they would not be covered under the American Guarantee excess policy. [Citations.]

"7. Plaintiffs' reliance on Condition 9(d) does not create a material issue of fact because that Condition is inapplicable on its face. [Citation.] Not even

plaintiffs are arguing that they changed the Underlying Insurance and failed to keep American Guarantee informed of such change.

"8. At the 10/19/09 oral argument, plaintiffs withdrew their reliance on Coverage B."

The court entered judgment for American Guarantee and against plaintiffs on March 9, 2010. Notice of entry of judgment was served on March 24, 2010.

## III. *The Present Appeal*

On May 21, 2010, plaintiffs filed a notice of appeal from (1) the judgment entered on March 9, 2010, in favor of American Guarantee, (2) the order on March 9, 2010, reconsidering and granting summary judgment to American Guarantee, (3) the order entered February 11, 2010, granting summary judgment to Suddock, (4) the order entered October 19, 2009, denying summary judgment to plaintiffs, and (5) the order entered January 13, 2009, denying summary judgment to plaintiffs.

## DISCUSSION

## STANDARD OF REVIEW

" 'A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. [Citation.] We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.]' (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].)" (*Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1021 [124 Cal.Rptr.3d 105]; see *California Restaurant Management Systems v. City of San Diego* (2011) 195 Cal.App.4th 1581, 1590–1591 [126 Cal.Rptr.3d 160] ["Our 'review [of] a grant of summary judgment [is] de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law.' "].)

## APPEAL OF THE JUDGMENT FOR AMERICAN GUARANTEE

Plaintiffs contend there are triable issues of material fact as to whether the Rodriguez claim is covered by the American Guarantee policy. Specifically, they urge that because the American Guarantee policy does not specify any

particular primary policies to which it provides excess coverage, but rather indicates that such primary policies are "TBD" (to be determined), the American Guarantee policy should be interpreted to provide excess coverage above *all* primary general liability policies issued to plaintiffs in any year, including the 1993–1994 Crusader policy.

For the following reasons, we conclude that although the American Guarantee policy contains some ambiguities, it cannot reasonably be interpreted to provide coverage for the Rodriguez claim. Therefore, the trial court correctly granted American Guarantee's summary judgment motion and denied plaintiffs'.

## I. *Principles of Insurance Contract Interpretation*

The legal principles applicable to interpreting insurance policies are not in dispute. The Supreme Court in *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390–391 [33 Cal.Rptr.3d 562, 118 P.3d 589], summarized these principles as follows:

■ " 'When determining whether a particular policy provides a potential for coverage . . . , we are guided by the principle that interpretation of an insurance policy is a question of law. [Citation.]' [Citation.]

" 'The insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there is no coverage. [Citation.] We apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy.' [Citations.]

"In reviewing de novo a superior court's summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts. We reiterated those rules in our decision in [*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 [77 Cal.Rptr.2d 107, 959 P.2d 265]]:

" ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citations.] "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit, it governs." [Citation.]' (*Foster-Gardner, supra*, 18 Cal.4th at p. 868.)

■ " ' "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does "[d]isagreement concerning the meaning of a phrase," or " 'the fact that a word or phrase isolated from its context is susceptible of more than one meaning.' " [Citation.] " '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " [Citation.] "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." [Citation.]' (*Foster-Gardner, supra,* 18 Cal.4th at p. 868.)

". . . [S]tandard form policy provisions are interpreted under the same rules of construction. ' "[W]hen they are examined solely on a form, i.e., apart from any actual agreement between a given insurer and a given insured, the rules stated above apply *mutatis mutandis.* That is to say, where it is clear, the language must be read accordingly, and where it is not, in the sense that satisfies the hypothetical insured's objectively reasonable expectations." ' [Citation.]"

With these principles in mind, we turn to the language of the American Guarantee policy.

II. *The Trial Court Did Not Err in Granting American Guarantee's Motion for Summary Judgment*

    A. *The American Guarantee Policy Cannot Reasonably Be Interpreted to Cover the Rodriguez Claim*

        1. *The American Guarantee Coverage Is Excess to Capital Insurance Policies Issued for the Term "07/15/05 to 07/15/06"*

Coverage A[1] of the American Guarantee policy provides that American Guarantee "will pay on behalf of the insured, those damages covered by this insurance in excess of the total applicable limits of underlying insurance." Further, "[n]otwithstanding anything to the contrary contained above, if underlying insurance does not apply to damages, for reasons other than

---

[1] The American Guarantee policy also provided "Umbrella Liability Insurance" under "Coverage B." Plaintiffs conceded in the trial court that Coverage B did not apply, and they have not relied on it on appeal.

exhaustion of applicable limits of insurance by payment of claims, then Coverage A does not apply to such damages." By its plain language, therefore, Coverage A applies to a claim only if the "underlying insurance" also applies.

Section V of the policy defines "underlying insurance" as "the policy or policies of insurance listed in the Schedule of Underlying Insurance forming a part of this policy." The Schedule of Underlying Insurance identifies the applicable underlying insurance as follows:

"Company: Capital Insurance Group [(or 'Capital Ins. Gr.')]

"Policy No.: TBD

"Term: 07/15/05 to 07/15/06

"Coverage: Commercial General Liability

"Applicable Limits: $1,000,000 Each Occurrence"

We agree with plaintiffs that this schedule is not entirely free of ambiguity because it does not provide the policy numbers of the underlying insurance policies. Nonetheless, it is not reasonably susceptible of the interpretation plaintiffs urge. That is, "underlying insurance," defined as policies issued by *"Capital Insurance Group"* (or "Capital Ins. Gr.") for the term *"07/15/05 to 07/15/06"* cannot reasonably be interpreted to mean a policy issued by *Crusader,* for the term *December 4, 1993, to December 4, 1994.*

### 2. *The American Guarantee Policy Applies Only to Claims in Excess of $1 Million*

Section II of the American Guarantee policy, "Limits of Insurance," provides in paragraph C that Coverage A "applies only in excess of the greater of the actual limits of insurance of underlying insurance *or the limits of insurance shown on the Schedule of Underlying Insurance forming a part of this policy."* (Italics added.) As we have noted, the Schedule of Underlying Insurance identifies the applicable limits of underlying insurance to be $1 million per occurrence. Thus, by its plain language, the American Guarantee policy applies only to claims *in excess of* $1 million per occurrence. This language cannot reasonably be interpreted to apply to the Rodriguez claim, which settled for $1 million *exactly.*

### 3. *The American Guarantee Policy Applies Only to the Scheduled Properties*

The American Guarantee policy declarations page identified the named insured as "RTG Investments, Inc.," and endorsement No. 2 to the policy

identified 25 properties covered by that policy. The Ingraham property was owned by the Wallmans, not RTG, and it was not included on endorsement No. 2. The policy thus cannot reasonably be interpreted to mean that the Ingraham property is a covered property.

For all of these reasons, we conclude that the American Guarantee policy cannot reasonably be interpreted to cover the Rodriguez claim.

### B.  *Plaintiffs' Contentions Are Without Merit*

Plaintiffs contend that because the Schedule of Underlying Insurance did not identify specific policies, but instead indicated that the policy numbers were "TBD" (to be determined), the schedule was incomplete and, accordingly, must be interpreted to provide excess coverage "above *any or all* underlying general liability insurance unless and until American Guarantee had 'determined' to which policy or policies the excess coverage would be further limited." (Italics added.) Any other interpretation, plaintiffs suggest, would lead to an absurd result—"no policies could constitute underlying insurance until the policies that would constitute underlying insurance were 'determined.' "

We do not agree. Plaintiffs' contention assumes that there are only two possible interpretations of the American Guarantee policy—either it is excess to *all* primary policies ever issued to plaintiffs, or it is excess to *no* primary policies until American Guarantee determines the relevant policy numbers. Because the latter interpretation renders coverage illusory, plaintiffs suggest, the policy must be interpreted to mean the former. But there is at least one additional possible interpretation of the policy that we believe is far truer to its language: that the American Guarantee policy is excess to all Capital policies for the 2005–2006 policy year. This interpretation neither renders coverage illusory nor—as plaintiffs' proposed interpretation does—makes the references to Capital Insurance and the 2005–2006 policy year "surplusage." (E.g., *Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 18 [125 Cal.Rptr.3d 522] [" 'If possible, we should give effect to every provision and avoid rendering any part of an agreement surplusage.' "].)

■  Plaintiffs next contend that because the Schedule of Underlying Insurance does not identify specific policies, it is ambiguous and must be construed as they suggest to protect their "objectively reasonable expectations." Again, we do not agree. As an initial matter, we reject plaintiffs' contention that "TBD" renders the policy per se ambiguous. "As California courts previously have observed, the 'meaning of language is to be found *in its applications*. An indeterminacy in the application of language signals its vagueness or ambiguity. An ambiguity arises when language is reasonably

susceptible of more than one application to material facts. There cannot be an ambiguity per se, i.e.[,] an ambiguity unrelated to an application.' (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1986) 177 Cal.App.3d 855, 859, fn. 1 [223 Cal.Rptr. 246]; see also *Herzog v. National American Ins. Co.* (1970) 2 Cal.3d 192, 199, fn. 5 [84 Cal.Rptr. 705, 465 P.2d 841] ['language which might be considered ambiguous as applied to some circumstances is not necessarily ambiguous per se'].)" (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391 [46 Cal.Rptr.3d 668, 139 P.3d 56], italics added; see *Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 322 [110 Cal.Rptr.3d 612, 232 P.3d 612] ["The existence of a material ambiguity in the terms of an insurance policy may not, of course, be determined in the abstract, or in isolation. The policy must be examined as a whole, and in context, to determine whether an ambiguity exists."].) Thus, the proper question is not whether "TBD" is ambiguous in the abstract, but rather whether it is ambiguous in the context of *this* policy and *this* case. (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 868 [21 Cal.Rptr.2d 691, 855 P.2d 1263] (*Bay Cities*).)

We find that the policy considered as a whole is not reasonably susceptible to the interpretation plaintiffs advocate. (See *Bay Cities, supra*, 5 Cal.4th at p. 868 ["We find no ambiguity because the construction of 'related' advocated by Bay Cities is not reasonable."].) That is, while the acronym "TBD" could create an ambiguity in some circumstances (for example, if a dispute arose as to *which* Capital policies constituted underlying insurance), in the present circumstances—where the Schedule of Underlying Insurance identifies "Capital Insurance Group" as the insurer providing the underlying insurance—the use of "TBD" created no ambiguity as to whether relevant underlying insurance included not only Capital policies, but Crusader policies as well. Further, we are not persuaded that plaintiffs' asserted expectation that American Guarantee would indemnify plaintiffs for *any* loss in excess of that covered by *any* primary policy issued in *any* year is objectively reasonable. To the contrary, because the Schedule of Underlying Insurance provided both the name of the underlying insurer and the relevant policy period, we conclude that plaintiffs' asserted expectation of coverage was objectively *unreasonable*.

Plaintiffs next contend that provisions that take away or limit coverage reasonably expected by the insured are enforceable only if they are conspicuous, plain, and clear. The reference to underlying insurance in the American Guarantee policy was none of these things, plaintiffs say: "[T]he insuring agreement extends coverage over underlying insurance. But then an insured must refer to the definition of underlying insurance set forth 9 pages into the 14 page policy to learn that it must then refer to yet a third place, a Schedule of Underlying Insurance, which in this case is incomplete. The attempt to limit coverage to only certain policies . . . which American Guarantee failed

to delineate is neither conspicuous, plain, nor clear. It is hard to imagine that an incomplete schedule could be anything but unclear and therefore unenforceable to limit coverage."

Plaintiffs are correct that " 'to be enforceable, any provision that *takes away or limits* coverage reasonably expected by an insured must be "conspicuous, plain and clear." [Citation.]' " (*Essex Ins. Co. v. City of Bakersfield* (2007) 154 Cal.App.4th 696, 705 [65 Cal.Rptr.3d 1], italics added.) They err, however, in urging that that rule applies here. Indeed, they have not pointed to any provision of the American Guarantee policy that purports to create coverage in excess of *all* primary policies issued in any year, which is then "limited" by the Schedule of Underlying Insurance—and based on our independent review of the policy, no such provision exists. Thus, plaintiffs have not established that the Schedule of Underlying Insurance is a provision that "takes away or limits" coverage. Moreover, we believe the policy language clearly indicates that the Schedule of Underlying Coverage *creates*, rather than limits, coverage. The doctrine on which plaintiffs rely, therefore, simply has no application here.

█ Plaintiffs contend finally that American Guarantee was not entitled to summary adjudication of plaintiffs' bad faith claim because the insurer's conduct in denying benefits was not objectively reasonable as a matter of law. Not so. For all the reasons we have previously articulated, plaintiffs did not have an objectively reasonable expectation of coverage, and thus American Guarantee's denial of benefits was reasonable as a matter of law. For all of the same reasons, plaintiffs were not entitled to summary judgment, and the trial court properly denied their motion.

## APPEAL OF THE JUDGMENT FOR SUDDOCK[2]

### I. *Applicable Legal Principles*

█ Plaintiffs' sole claim against Suddock is for negligence. To establish negligence, plaintiffs must prove (1) Suddock's legal duty of care towards plaintiffs, (2) Suddock's breach of that duty, (3) injury to plaintiffs as a proximate result of the breach, and (4) damage to plaintiffs. (*Jones v. Grewe*

---

[2] Suddock asserts Nancy Wallman, Stan Wallman, and Sea Val Enterprises were not parties to the action when the trial court granted his summary judgment motion and thus have no standing to pursue this appeal. We disagree. They cannot relitigate this issue and the judgment caused their family enterprise to suffer substantial pecuniary harm. As a result, they have appellate standing. (*Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 295 [50 Cal.Rptr.2d 493].) As to Suddock's claim that Barry Wallman lacks standing to appeal because he did not purchase insurance from Suddock, Barry is an aggrieved party and may bring this appeal. (Code Civ. Proc., § 902.)

(1987) 189 Cal.App.3d 950, 954 [234 Cal.Rptr. 717] (*Jones*).) Whether a duty of care exists is a question of law for the court. (*Ibid.*)

■ Ordinarily, an insurance agent "assumes only those duties normally found in any agency relationship. This includes the obligation to use reasonable care, diligence, and judgment in procuring the insurance requested by an insured. [Citation.] The mere existence of such a relationship imposes no duty on the agent to advise the insured on specific insurance matters. [Citations.]" (*Jones, supra*, 189 Cal.App.3d at p. 954.) Instead, in the ordinary case, "the onus is . . . squarely on the insured to inform the agent of the insurance he requires." (*Paper Savers, Inc. v. Nacsa* (1996) 51 Cal.App.4th 1090, 1096 [59 Cal.Rptr.2d 547] (*Paper Savers*).)

An insurance agent may assume a greater duty to the insured by "holding himself out to be more than an 'ordinary agent' " or by misrepresenting the policy's terms or extent of coverage. (*Paper Savers, supra*, 51 Cal.App.4th at pp. 1096–1097.) In other words, while agents do not generally have a duty to advise insureds regarding the sufficiency of their liability limits, once agents elect to respond to these inquiries, "a special duty ar[ises] requiring them to use reasonable care." (*Free v. Republic Ins. Co.* (1992) 8 Cal.App.4th 1726, 1729 [11 Cal.Rptr.2d 296] (*Free*).)

Plaintiffs allege there are triable issues of fact as to whether Suddock breached the ordinary duty of care by failing to obtain the insurance they say they requested—i.e., excess insurance over existing *and past* primary insurance policies. They further allege there are triable issues of fact as to whether Suddock assumed additional duties by holding himself out as an insurance expert and advising them of the adequacy of their coverage, and whether he breached these additional duties. We consider these issues below.

II. *There Are No Triable Issues of Material Fact as to Suddock's Alleged Failure to Procure the Insurance Plaintiffs Requested and Suddock Agreed to Provide*

■ It is undisputed that an insurance agent's failure to procure agreed-upon coverage is actionable negligence. Plaintiffs contend this principle is implicated here because Suddock failed to obtain the coverage they requested. Specifically, they contend they asked Suddock to obtain insurance that would provide them with "an additional layer of liability protection to go up and beyond any other insurance they had." Such protection, they urge, would have included not only the insurance excess to their current primary policies, but also insurance excess to primary policies issued in prior years. For the following reasons, we do not agree.

In *Ahern v. Dillenback* (1991) 1 Cal.App.4th 36 [1 Cal.Rptr.2d 339] (*Ahern*), cited by Suddock, the plaintiff purchased an automobile insurance policy that provided coverage in Europe. Before purchasing the policy, the plaintiff told the agent that she wanted " 'the best policy there is,' " and the agent told the plaintiff that she would receive full coverage with policy limits that would protect her and her husband. (*Id.* at p. 40.) The plaintiff was not familiar with uninsured motorist coverage and did not discuss it with her agent. (*Ibid.*) Subsequently, she was seriously injured when she was hit by an unidentified and uninsured motorist. She made a claim under her policy, but the insurer denied it. She then sued her agent for negligent procurement of insurance. (*Id.* at p. 41.) The trial court granted the agent's motion for summary judgment, and the Court of Appeal affirmed. It explained that the gist of the plaintiff's cause of action was that the agent breached his duty by "not including various coverages in the Ahern policy notwithstanding the fact [plaintiff] did not request these coverages or . . . not advising [plaintiff] about the availability." (*Id.* at p. 42.) Under the circumstances of the case, there was no breach of duty because, although an agent " ' "may point out to [the insured] the advantages of additional coverage and may ferret out additional facts from the insured applicable to such coverage, . . . he is under no obligation to do so." ' " (*Id.* at p. 43.)

Similarly, in *Fitzpatrick v. Hayes, supra*, 57 Cal.App.4th 916 (*Fitzpatrick*), the plaintiff was seriously injured when she was struck by a car. She received $15,000 from the other driver's insurer and $85,000 from her own insurer under a $100,000 uninsured/underinsured policy. She then sued her insurance agent for negligence, contending that had the agent advised her of the availability of a "personal umbrella" policy, which offered up to $1 million in coverage, she would have purchased it. (*Id.* at p. 919.) The trial court entered summary judgment for the agent, and the Court of Appeal affirmed. (*Id.* at p. 920.) It noted that although the plaintiff and her husband had generally indicated that they wanted the upper limits of coverage, they "*never* raised the subject of either personal umbrella coverage or additional underinsured motorist coverage with [their agent] at any time nor did [their agent] give them advice regarding higher or additional underinsured motorist coverage." (*Id.* at p. 928.) Accordingly, "the combination of the conclusory and non-specific evidence proffered by appellants as to what [the agent] had in fact advised them and these very clear denials of both any sort of targeted inquiry by them or advice by [the agent] defeats appellants' claim that [the agent] knew or should have known that they wanted a personal umbrella policy." (*Id.* at pp. 928–929.)

The present case is analogous to *Ahern* and *Fitzpatrick*. As in those cases, by plaintiffs' own admissions their statements to Suddock about the kind of coverage they wanted were extremely general in nature. Dan and Barry Wallman said in their declarations that they told Suddock they needed "higher

insurance limits to adequately protect us should another substantial claim be made," and Barry Wallman testified at his deposition that he asked Suddock to " 'make sure that we're covered for any possible lawsuit that could happen in the future.' " Neither Barry nor Dan recalled telling Suddock they wanted insurance for past years or for properties their family no longer owned. And, neither Barry nor Dan recalled discussing the Ingraham property with Suddock or seeking insurance for it. Under these circumstances, Suddock could not reasonably have known that plaintiffs wanted excess insurance for past years or for properties they no longer owned.

In support of their claim that Suddock failed to procure the agreed-upon coverage, plaintiffs rely on *Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110 [55 Cal.Rptr.2d 276] (*Desai*). There, the plaintiff sought to purchase earthquake, fire, and hazard insurance to protect his property. He told his agent that he wanted 100 percent coverage for the cost of repairing or replacing improvements to the property, including any increases for inflation. The agent told the plaintiff that Farmers offered the kind of insurance he wanted and, in reliance on her representations, the plaintiff purchased a policy. (*Id.* at p. 1114.) Subsequently, two of the structures on the plaintiff's land were destroyed by an earthquake and a third structure was destroyed by fire. However, although the plaintiff's total loss exceeded $500,000, Farmers agreed to pay only liability limits of about $150,000. (*Id.* at p. 1115.)

The plaintiff sued the agent for negligence for advising him to purchase insurance that was not what he said he needed, and he sued Farmers for respondeat superior liability for the agent's negligence. (*Desai, supra,* 47 Cal.App.4th at p. 1115.) The trial court sustained Farmers's demurrer, but the Court of Appeal reversed. It explained: "This is not a situation wherein an insured belatedly realized—after an accident occurred and a claim was made and denied—that he or she should have had more or different coverage. Rather, Desai demanded a particular level of coverage at the outset, before he agreed to purchase a policy. It was then represented to him that he was receiving the demanded level of coverage from Farmers, and only afterwards did he discover the coverage he purchased was not what he had demanded nor what the insurer and its agent warranted it was. This is not a 'failure to recommend more coverage' case; it is a 'failure to deliver the agreed-upon coverage' case. [¶] A 'failure to deliver the agreed-upon coverage' case is actionable, unlike the 'failure to recommend' cases cited by Farmers." (*Id.* at p. 1119.)

We do not agree with plaintiffs that the present case is analogous to *Desai*. Plaintiffs' vague requests for insurance that would protect them in the event of "any possible lawsuit that could happen in the future" in no way resembles the plaintiff's specific request for 100 percent replacement coverage in *Desai*.

Instead, they are analogous to the plaintiff's vague statement in *Ahern* that she wanted "the best policy there is" and the plaintiff's statement in *Fitzpatrick* that she and her husband wanted the upper limits of coverage. We therefore conclude there are no triable issues of fact to support plaintiffs' contention that Suddock failed to procure the coverage they requested.

III. *There Are No Triable Issues of Material Fact as to Whether Suddock Held Himself Out as an Insurance Expert*

An agent may assume additional duties to an insured by holding himself out as an expert; in such a case, the agent may be liable to the insured for losses that resulted from a breach of those additional duties. (*Jones, supra*, 189 Cal.App.3d 950; *Fitzpatrick, supra*, 57 Cal.App.4th at p. 927.) Plaintiffs contend there are triable issues of fact as to whether Suddock held himself out as an apartment building insurance expert and, thus, whether additional duties apply here. We do not agree.

In *Jones, supra*, 189 Cal.App.3d 950, a child sustained serious injuries when she fell into the swimming pool of an apartment building owned by the insureds. (*Id.* at p. 953.) The child's parents sued the insureds for negligence, ultimately settling the action for $1.5 million. The insureds then sued their insurance agent for negligence, asserting that he had held himself out as an insurance expert, had taken care of the insureds' insurance needs for 10 years, during which time the insureds relied on his expertise, and had expressly and impliedly represented that the insureds' insurance protection was adequate. (*Ibid.*) The trial court sustained the agent's demurrer without leave to amend, and the Court of Appeal affirmed. It explained: "The mere allegation in a complaint, as in this case, that an insured has purchased insurance from an insurance agent for several years and followed his advice on certain insurance matters is insufficient to imply the existence of a greater duty. Such reliance is not at all uncommon when an insured has done business with an insurance agency over a period of time." (*Id.* at p. 956.)

The present case is analogous to *Jones*. The Wallmans' statements that Suddock "held himself out to us as an expert in insurance matters, and specifically, for the type of risks our family business encountered" and "offered to act as our insurance consultant, advising us on our insurance needs" are too conclusory to raise a triable issue of fact. Notably missing from these statements are *what* Suddock said to give rise to the Wallmans' purported belief that he was an expert in insurance matters. And, under *Jones*, the mere assertion that plaintiffs purchased insurance from Suddock for several years and followed his advice on insurance matters is insufficient to create a heightened duty.

Plaintiffs claim that the present case differs from *Jones* and other cases because Suddock "was also aware of and counseled us on the strategy of separating each apartment building or property into a separate entity to shield unrelated properties from claims arising from other of our properties." We do not agree. This statement is simply too conclusory to support a denial of summary judgment. Significantly, it does not explain the context in which Suddock suggested that plaintiffs separately insure each property and what Suddock counseled regarding risk management.

For all of these reasons, there are no triable issues of fact as to whether Suddock held himself out as an insurance expert.

IV.  *There Are No Triable Issues of Material Fact as to Suddock's Alleged Misrepresentations Regarding the Scope of Plaintiffs' Coverage*

█  Under some circumstances, an agent's misrepresentation about the scope of an insured's coverage can constitute actionable negligence. Plaintiffs contend Suddock's alleged statement that he " '*could not imagine any claim that came that would not be covered*' " by the excess policy constitutes such a misrepresentation and gives rise to a cause of action for negligence. (Italics added.) For the following reasons, we do not agree.

█  In *Jones*, discussed above, the plaintiffs asserted that their agent assumed heightened duties to them by " 'expressly and impliedly' " representing that plaintiffs' insurance protection was adequate. (*Jones, supra*, 189 Cal.App.3d at p. 953.) The court disagreed, concluding that the plaintiffs' allegation was insufficient to support a cause of action for negligence. It explained: "Nor can the existence of a broader agency relationship warranting the imposition of a greater duty be reasonably inferred from the complaint's allegation that respondents had assured appellants of the adequacy of their liability coverage. As the court noted in *Sandbulte* v. *Farm Bureau Mut. Ins. Co.* [(Iowa 1984)] 343 N.W.2d 457, an insured's request for 'sufficient coverage' and an agent's assurance that the policy provided 'adequate' coverage do not, in and by themselves, imply an 'expanded principal-agent relationship.' . . . [¶] . . . Ordinarily, the person seeking liability insurance knows better than the insurance agent the extent of his personal assets, and the premium he can afford or is willing to pay. Here, the complaint did not allege that respondents knew the extent of appellants' personal assets. All we have is a vague and conclusionary allegation that 'financial information' regarding appellants was made available to respondents. No facts were alleged from which it could be reasonably inferred that such information accurately reflected the extent of appellants' personal assets, and that respondents failed to consider the information in procuring a liability insurance policy with a $300,000 limit." (*Jones, supra*, at pp. 956–957.)

Similarly, in *Fitzpatrick, supra*, 57 Cal.App.4th at page 928, the court found no actionable misrepresentation where the agent told the insureds that their liability limits " 'should be about right. . . . [T]he summation was everything else seemed fine.' " According to the court, it was highly relevant that, by the insureds' own admissions, they never raised the subject of personal umbrella coverage or additional underinsured motorist coverage. Thus, the insureds' "very clear denials of both any sort of targeted inquiry by them or advice by [the agent] defeats [the insureds'] claim that [the agent] knew or should have known that they wanted a personal umbrella policy." (*Id.* at p. 929.)

The court reached a different result in *Paper Savers, supra*, 51 Cal.App.4th 1090. There, Paper Savers, a paper bag manufacturing company, bought commercial insurance from the defendant insurance agent. According to Paper Savers's president, the agent represented that the insurance purchased would provide full coverage to replace all business personal property in case of a total loss, regardless of the policy limit. However, when Paper Savers was destroyed by fire, the insurer paid only the policy limit of $500,000, even though the total losses were nearly $2 million. (*Id.* at p. 1093.) Paper Savers sued the agent for negligence, and the agent moved for summary judgment, asserting that he owed no duty to ensure Paper Savers had adequate coverage. The trial court agreed and granted summary judgment. The Court of Appeal reversed. (*Id.* at p. 1094.) It noted that under established law, an insurer may assume a heightened duty to his insured by misrepresenting the policy's terms or extent of coverage. (*Id.* at pp. 1096–1097.) In the case before that court, the agent suggested the replacement cost coverage endorsement and negligently explained that the endorsement was sufficient to replace all lost or damaged personal property regardless of policy limits. (*Id.* at p. 1099.) Thus, "this case involves a special duty to ensure such coverage based on alleged affirmative assertions made to induce the insured to purchase the policy and additional endorsement. . . . This allegation takes the case out of the ordinary general duty of care and triggers a greater and special duty to the insured as a result of the insurance agent's alleged representations." (*Id.* at p. 1101.)

The court similarly found an agent's affirmative representations sufficient to support a cause of action for negligence in *Free, supra*, 8 Cal.App.4th 1726. There, the defendant insurance company issued the plaintiff a home-owners policy in 1979. That year and every succeeding year until 1989, the plaintiff contacted his insurance agent and asked whether his coverage limits were adequate to rebuild his home; on each occasion, he was told they were. When the plaintiff's home was completely destroyed by fire in 1989, however, the plaintiff discovered that his policy limits were insufficient to replace his home. (*Id.* at p. 1729.) He sued his agent for negligence, asserting that the agent had a duty to provide him with accurate information and breached this duty by advising him that his coverage was adequate. (*Ibid.*) The court held

that the plaintiff's claim stated a cause of action for negligence. It explained: "Clearly defendants were not required under the general duty of care they owed plaintiff to advise him regarding the sufficiency of his liability limits or the replacement value of his residence. [Citation.] Nonetheless, once they elected to respond to his inquiries, a special duty arose requiring them to use reasonable care." (*Ibid.*)

Suddock's alleged statement that he " '*could not imagine any claim that came that would not be covered*' " by the excess policy does not bring the present case within the holdings of *Paper Savers* and *Free*. (Italics added.) In both *Paper Savers* and *Free*, the insureds made specific factual inquiries of the agents, and the agents responded with specific factual representations—in *Paper Savers*, that the insured's policy would provide full coverage to replace all business personal property in case of a total loss; in *Free*, that the insured's coverage limits were adequate to rebuild his home in the event of a loss. In the present case, in contrast, the insureds' inquiry was a general one—whether Suddock could imagine any claim that would not be covered by the policy. Suddock's response was equally general—that he could not imagine such a claim. This response is analogous to the agents' asserted representations in *Jones* and *Fitzpatrick* and does not support a cause of action for negligence.

The result is no different because Suddock's alleged representation was made in the context of discussions of the so-called Park Avenue claim. According to plaintiffs, triable issues of material fact remain as to whether Suddock made an actionable misrepresentation because he assured them that he could not imagine a claim for which they would not be covered "in response to an inquiry by the insured for a particular type and extent of coverage, i.e., excess or umbrella coverage so that they would not be underinsured again as they might have been with the Park Avenue claim." The Park Avenue claim, however, was made contemporaneously with the injury under a then existing primary policy. Nothing about the discussion concerning the Park Avenue claim could reasonably have suggested to Suddock that plaintiffs were seeking not only a standard excess policy, but also coverage excess to former primary policies that insured property they no longer owned.

For all of these reasons, the trial court properly granted summary judgment for Suddock.

## DISPOSITION

The judgment and orders for respondents and against appellants are affirmed. Respondents shall recover their costs on appeal.

Epstein, P. J., and Willhite, J., concurred.

A petition for a rehearing was denied December 7, 2011.