Filed 11/13/14  Siegfried v. Pacific Specialty Ins. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ELAINE SIEGFRIED, | B250192 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC477969) |
| v. | |
| PACIFIC SPECIALTY INSURANCE COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rolf M. Treu, Judge.  Affirmed in part, reversed in part and remanded.

Losh & Khoshlesan and Stephen M. Losh for Plaintiff and Appellant.

Shoecraft and Burton, Devin T. Shoecraft and Michelle L. Burton for Defendant  and Respondent Pacific Specialty Insurance Company.

Lewis Brisbois Bisgaard & Smith, Michael B. Magloff and Brian Slome for Defendant and Respondent Cappuccino Insurance Agency, Inc.

In this insurance coverage dispute, Elaine Siegfried appeals from the judgment entered following the trial court's orders granting summary judgment in favor of Pacific Specialty Insurance Company (Pacific Specialty) and Cappuccino Insurance Agency (Cappuccino).  Appellant purchased a homeowner's insurance policy from Pacific Specialty through Cappuccino.  She filed a claim with Pacific Specialty after her home was destroyed in a fire, but she requested an appraisal when Pacific Specialty paid an amount less than the policy limit.  After Pacific Specialty paid the policy limit, appellant sought payment under her extended replacement cost coverage.  Pacific Specialty denied the claim.  Appellant filed a complaint asserting negligence by Cappuccino and breach of contract and breach of the implied covenant of good faith and fair dealing by Pacific Specialty.  She appeals from the judgment entered following the trial court's orders granting summary judgment in favor of Pacific Specialty and Cappuccino.  We affirm the judgment in favor of Cappuccino but reverse the judgment in favor of Pacific Specialty and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

*The Homeowner's Insurance Policy*

Appellant purchased residential property in West Hills, California in 1994 and has maintained homeowner's insurance on the property since she purchased it.

---

**1**     "'Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion.  [Citation.]'"  (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 716-717 (*Wilson*).)  The trial court sustained Cappuccino's objections to portions of appellant's declaration and to exhibits submitted by appellant in opposition to Cappuccino's summary judgment motion.  The court sustained Pacific Specialty's objections to portions of the declarations of appellant and of David Lettiere, a public insurance adjuster, as well as objections to exhibits submitted by appellant.  We do not rely on evidence to which the court sustained objections.

In 2008, appellant purchased a homeowner's insurance policy for the property from Pacific Specialty through Joey Cappuccino (Joey), whom she knew through his work as a mortgage broker. Appellant had occasionally worked for Joey as a real estate appraiser, and she considered him a work colleague. Joey told appellant that he was an insurance agent and would like the opportunity "to run the numbers for her" when her homeowner's insurance policy was up for renewal.

Appellant contacted Joey when her policy came up for renewal, and he asked appellant for the address and size of her home "so he could run the numbers." Other than giving him the address and size of her home, appellant did not speak with Joey about the amount of insurance she needed. She did not ask Joey about the amount of insurance she needed, and she did not recall him asking her how much insurance she wanted. Appellant trusted Joey and assumed he would choose the correct amount of coverage for her. Appellant signed an application for insurance from Pacific Specialty in July 2008. Appellant did not recall having any discussions with Joey regarding the insurance application or the amount of insurance she needed, and she did not ask for a specific amount of coverage.

Susan Valencia, a Senior Vice President for Pacific Specialty, explained in a declaration that a dwelling can be classified as "Standard," "Standard Plus," "Deluxe," or "Deluxe Plus." Appellant's application for the insurance policy described her home as "Standard," which resulted in an estimated value of $144,375, based on Pacific Specialty's cost estimator. Including estimates for a garage and fireplace, the total estimated replacement cost was $171,000.[2] The application included "Extended Replacement Cost Dwelling" coverage of 20

---

[2] In her deposition, appellant noted that she did not have a fireplace, but she did not notice this in the policy because she did not read it carefully.

3

percent at a cost of $34.[3] It was undisputed that Joey did not explain the insurance policy, the replacement cost, or the extended replacement cost coverage to appellant.

The application contained a statutorily-mandated "Replacement Cost Disclosure," which stated that "Limited Replacement Cost Coverage" applied to appellant's policy, and explained as follows: "In the event of any covered loss to your home, the insurance company will pay to repair or replace the damaged or destroyed dwelling with like or equivalent construction up to a specified percentage over the policy's limits. See the declarations page of your policy for the limit that applies to your dwelling. Your policy will specify whether you must actually repair or replace the damaged or destroyed dwelling in order to recover this benefit. The amount of recovery will be reduced by any deductible you have agreed to pay. To be eligible for this coverage, you must insure the dwelling to its full replacement cost at the time the policy is issued, with possible periodic increases in the amount of coverage to adjust for inflation; you must permit an inspection of the dwelling by the insurance company; and you must notify the

---

[3]    "Unlike basic or limited replacement cost coverage, extended replacement cost coverage is not limited by the dollar amount of coverage listed in the declarations page. Rather, if necessary to fully repair or replace damaged or destroyed property, the policy will extend compensation up to an additional percentage (e.g., 125 percent) above the stated limits in the declaration for the dwelling." (Barron et al., Cal. Property Insurance: Law and Litigation (CEB) § 12.15B; see Ins. Code, § 10102 [setting forth requisite language for replacement cost disclosure]; see also Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2014) ¶ 6:359.4, p. 6B-80 ["Extended replacement cost coverage provides indemnity up to *a specified percentage* (e.g., 10%) or specific dollar amount *above the policy limit*."].) Thus, if, for example, the policy limit was $171,000, the 20 percent extended replacement cost provided for an extra $34,200 in coverage, resulting in a coverage limit of $205,200. (See *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1204 (*Major*) [calculating the amount of coverage where the extended replacement cost was 25 percent over the policy limits].)

insurance company about any alterations that increase the value of the insured dwelling by a certain amount (see your policy for that amount). Read your declaration page to determine whether your policy includes coverage for building code upgrades."[4] (See former Ins. Code, § 10102 (2008 version), amended in 2010.)

Pacific Specialty inspected the property in August 2008, and required appellant to trim some trees in order to comply with its guidelines. After appellant had the trees trimmed, Pacific Specialty reinspected the property.[5]

Appellant received a homeowner's insurance policy from Pacific Specialty for the term of July 22, 2008 to July 22, 2009. The estimated replacement cost was $171,000, and the limit in coverage was $171,000 for the home. Appellant's premium was $565 for the $171,000 in coverage on the dwelling, plus $34 for 20

---

[4] The phrase "full replacement cost" does not appear to be defined in the policy, and neither party has pointed us to any definition. Insurance Code section 2051.5 addresses how replacement cost is measured, stating that, "Under an open policy that requires payment of the replacement cost for a loss, the measure of indemnity is the amount that it would cost the insured to repair, rebuild, or replace the thing lost or injured, without a deduction for physical depreciation, or the policy limit, whichever is less." (Ins. Code, § 2051.5, subd. (a).) "An open policy is one in which the value of the subject matter is not agreed upon, but is left to be ascertained in case of loss." (*Id.*, § 411.) The other type of insurance policy is a valued policy, which "expresses on its face an agreement that the thing insured shall be valued at a specified sum." (*Id.*, § 412.) As noted above, the provision at issue here is for *extended* replacement cost coverage, which provides for coverage above the policy limit.

[5] Neither party points out that the August 7, 2008 inspection report states that "Coverage" is $171,000, and "Replacement Cost" is $201,375. This is inconsistent with the $171,000 estimated replacement cost in the policy. Nonetheless, Pacific Specialty does not rely on this report as evidence of the estimated replacement cost. To the contrary, Pacific Specialty cites Valencia's deposition to argue that the inspection that it requires of its insureds' properties does *not* include any evaluation of whether the property is properly classified or whether the policy limits are properly set.

5

percent extended replacement cost coverage for the dwelling. The policy stated: "The limit of liability for this structure (Coverage A) is based on an estimate of the cost to rebuild your home, including an approximate cost for labor and materials in your area, and specific information you have provided about your home." The policy further warned that "it is ultimately the insured's responsibility to obtain adequate insurance coverage. If you feel that the dwelling replacement cost estimated above is insufficient, you should increase the coverage to the appropriate amount."

Appellant scanned the policy and did not read the details. She did not look at the policy to see the amount of the insurance. Appellant stated in her deposition that she did not recall receiving the entire insurance policy before signing it, pointing out that the fax indicated that she received only two pages, both of which were only the signature pages.

Appellant renewed the homeowner's insurance policy in May 2010.[6] She paid for the renewal without examining the policy, based on the assumptions that the insurance was "working . . . fine so far," and that she could trust Joey and Pacific Specialty. The renewed policy is at issue here.

The renewed policy increased the estimated replacement cost to $184,000. As pertinent here, the renewal provided a limit of $190,000 under Coverage A, Dwelling, plus 25 percent extended replacement cost coverage.[7] Appellant's

---

[6] According to Valencia, appellant also renewed the policy in 2009, but that renewal is not in the record.

[7] An endorsement entitled "Inflation Guard" stated that "A 3% increase to the limit of liability shown on the Declarations page of the policy for the insured dwelling (Coverage A) will be applied at renewal." Adding a 3 percent increase to the $171,000 policy limit from 2008 to 2009 and then again from 2009 to 2010 results in a limit of $181,413.90.

6

premium included payments of $611 for the $190,000 coverage and $37 for the 25 percent extended replacement cost coverage. The 25 percent extended replacement cost coverage meant that the $190,000 coverage limit for the dwelling was increased by $47,500 to $237,500. (See *Major*, *supra*, 169 Cal.App.4th at p. 1204 [where the policy provided coverage of $193,000 for the dwelling, a 25 percent extended replacement cost policy meant coverage of $241,250].)

*The Insurance Claim*

On December 19, 2010, a fire caused extensive damage to appellant's home. Appellant submitted a claim for the loss to Pacific Specialty.

Appellant hired a public insurance adjuster, David Lettiere, to act as her claim representative. In a March 11, 2011, letter to Lettiere, Pacific Specialty stated that the undisputed repair value of the home was $181,720.17. Pacific Specialty deducted $14,795.94 for depreciation and a $500 deductible, resulting in a payment of $166,244.68 to settle the dwelling portion of appellant's claim. Lettiere submitted a replacement cost value of approximately $270,000 for the home.

In May 2011, Lettiere requested an appraisal pursuant to the policy's appraisal clause. In November 2011, the appraisal panel determined the replacement cost value of the home to be $273,813.04. Based on the appraisal, Pacific Specialty paid an additional $8,742.07 to reach the policy limit of $190,000, but stated that it would not make any further payments.

In December 2011, appellant sought payment under her extended replacement cost coverage. In a January 2012 letter, Pacific Specialty denied appellant's claim for extended replacement cost coverage, stating that it "must

7

respectfully deny coverage under the Extended Replacement Cost endorsement because the home was not insured to its full replacement cost immediately prior to the loss." The letter also cited language in the policy that "'to be eligible to recover extended replacement cost coverage, you must insure the dwelling to its full replacement cost at the time the policy is issued.'" The letter explained that appellant's "home was insured with Coverage A dwelling limits of $190,000, based on her broker's selection of Standard level construction costs for the dwelling. The fire loss caused damage to approximately 80% of the dwelling. We understand that the appraisal award for replacement of 80% of the dwelling is in excess of $270,000. This would indicate that the full replacement cost at the time the policy was issued was well in excess of the $190,000 dwelling limits. The house was not insured to its full replacement cost at the time the policy was issued, and as a result [appellant] is not eligible for Extended Replacement Cost coverage under the endorsement."

*The Lawsuit*

Appellant filed a first amended complaint, asserting causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing against Pacific Specialty, and broker negligence against Cappuccino. She alleged that Pacific Specialty breached the policy by failing to pay her the proper amount of benefits and engaged in bad faith conduct in handling her claim. Appellant alleged that Cappuccino was obligated to use reasonable care in procuring insurance coverage and that it breached its duty by failing to obtain adequate coverage and failing to discuss the extended replacement cost coverage with her.

Pacific Specialty filed a motion for summary judgment or summary adjudication, arguing that there was no breach of contract because appellant underinsured her property and thus was not eligible for the extended replacement cost benefits. Pacific Specialty further argued that it did not breach the implied covenant of good faith and fair dealing because it did not unreasonably deny or delay payment of benefits. At a hearing, the trial court expressed the opinion that Pacific Specialty was entitled to summary adjudication as to the breach of contract cause of action, but that there may have been an issue regarding the covenant of good faith and fair dealing. Following another hearing, the court granted the summary judgment motion as to both causes of action and entered judgment in favor of Pacific Specialty.

Cappuccino filed a motion for summary judgment on the basis that it did not owe appellant a duty of care to provide her an insurance policy with sufficient policy limits. After holding a hearing, the trial court granted Cappuccino's summary judgment motion and entered judgment in favor of Cappuccino. Appellant filed a timely notice of appeal.

## DISCUSSION

I.    *Standard of Review*

On appeal from the grant of a summary judgment motion, "'"'[w]e review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.'" [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. [Citation.]' [Citation.]" (*Wilson, supra*, 42 Cal.4th at p. 717.)

9

"'A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. [Citations.] The moving party bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish,"' the elements of his or her cause of action. [Citation.]" (*Wilson*, *supra*, 42 Cal.4th at p. 720.)

II.      *Negligence Claim Against Cappuccino*

Appellant contends that the trial court erred in granting summary judgment in favor of Cappuccino on her negligence claim. "To establish negligence, [appellant] must prove (1) [Cappuccino's] legal duty of care towards [appellant], (2) [Cappuccino's] breach of that duty, (3) injury to [appellant] as a proximate result of the breach, and (4) damage to [appellant]. [Citation.] Whether a duty of care exists is a question of law for the court. [Citation.]

"Ordinarily, an insurance agent 'assumes only those duties normally found in any agency relationship. This includes the obligation to use reasonable care, diligence, and judgment in procuring the insurance requested by an insured. [Citation.] The mere existence of such a relationship imposes no duty on the agent to advise the insured on specific insurance matters. [Citations.]' [Citation.] Instead, in the ordinary case, 'the onus is . . . squarely on the insured to inform the agent of the insurance he requires.' [Citation.]" (*Wallman v. Suddock* (2011) 200 Cal.App.4th 1288, 1308-1309 (*Wallman*).)

"[A]n insurance agent generally has no duty to volunteer that an insured should obtain different or additional insurance coverage. 'The rule changes, however, when – but only when – one of the following three things happens: (a) the agent misrepresents the nature, extent or scope of the coverage being offered or

10

provided . . . , (b) there is a request or inquiry by the insured for a particular type or extent of coverage . . . , or (c) the agent assumes an additional duty by either express agreement or by "holding himself out" as having expertise in a given field of insurance being sought by the insured . . . .' [Citation.]" (*Roberts v. Assurance Co. of America* (2008) 163 Cal.App.4th 1398, 1403-1404 (*Roberts*).) Thus, "while agents do not generally have a duty to advise insureds regarding the sufficiency of their liability limits, once agents elect to respond to these inquiries, 'a special duty ar[ises] requiring them to use reasonable care.' [Citation.]" (*Wallman*, *supra*, 200 Cal.App.4th at p. 1309.)

Appellant contends that she has raised triable issues of fact as to whether Cappuccino assumed a special duty to obtain adequate insurance for her by initiating the procurement of the insurance and choosing the type and amount of insurance without consulting her or explaining the provisions to her.[8] We disagree. There is no evidence that Cappuccino assumed a greater duty to appellant by express agreement or by holding itself out as having special expertise. (See *Roberts*, *supra*, 163 Cal.App.4th at p. 1404.) We therefore conclude that appellant has failed to submit evidence sufficient to establish a triable issue of material fact as to Cappuccino's alleged negligence.

Appellant argues that Cappuccino assumed a special duty to obtain adequate insurance for her by acting unilaterally in selecting the insurance without explaining any of it to her. She relies on the undisputed evidence that, when she purchased the policy, she did not have any discussions with Joey regarding the

---

[8] An insurance agent may be found negligent by breaching the ordinary duty of care by failing to procure agreed-upon coverage. (*Wallman*, *supra*, 200 Cal.App.4th at p. 1309.) Appellant does not argue that Cappuccino breached its ordinary duty of care by failing to procure agreed-upon coverage, relying only on the doctrine of a special duty of care.

insurance, but merely assumed that Cappuccino would obtain the correct amount of insurance for her. She repeatedly testified in her deposition that she did not ask Joey any questions about the insurance policy because she trusted him to obtain the correct amount of insurance for her. Joey never told appellant he would insure the home for a specific amount, and appellant never asked about the amount of the coverage because she assumed she would "be fully covered if there was a disaster."

Although appellant presented evidence that she never questioned Joey or asked him any questions because she trusted him and assumed he would provide adequate coverage for her, she presented no evidence that he assumed a special duty to her. Despite her testimony that she assumed he would provide her "full" coverage in case of a loss, she never testified that she communicated to Joey what her expectations were regarding the coverage. Nor did she ask him any questions regarding the coverage. "[A]lthough an agent ""'may point out to [the insured] the advantages of additional coverage and may ferret out additional facts from the insured applicable to such coverage, . . . he is under no obligation to do so.'"" [Citation.]" (*Wallman*, *supra*, 200 Cal.App.4th at p. 1310.)

The facts here are different from *Free v. Republic Ins. Co.* (1992) 8 Cal.App.4th 1726, 1729-1731 (*Free*), in which the court found that the plaintiff sufficiently alleged that the insurance agents assumed a special duty of care to defeat a demurrer. There, the plaintiff homeowner contacted the defendant insurance agencies every year to ask whether the coverage limits of his policy were adequate to rebuild his home. Each time he was informed that they were. The court thus held that, although the defendants were "not required under the general duty of care they owed plaintiff to advise him regarding the sufficiency of his liability limits or the replacement value of his residence," "once they elected to

12

respond to his inquiries, a special duty arose requiring them to use reasonable care." (*Id.* at p. 1729.)

Unlike *Free*, in which the homeowner specifically asked if his coverage was sufficient to rebuild his home, it is undisputed that appellant never asked Cappuccino if her coverage was adequate to rebuild her home, neither when the policy first was issued nor when she renewed the policy in 2009 and 2010. Thus, appellant presented no evidence that a special duty arose.

This court found a triable issue of material fact as to the insurance agent's negligence in *Butcher v. Truck Ins. Exchange* (2000) 77 Cal.App.4th 1442 (*Butcher*). However, in that case, the plaintiff gave the insurance agent a copy of his current insurance policies and specifically instructed him to obtain the same coverage but at higher limits. The plaintiff's former policy included personal injury coverage, but, according to the plaintiff, the insurance agent neglected to tell him that the new policy he secured did not include personal injury coverage. Instead, the agent indicated to him that the new policy provided the same coverage as the former policy. Under those circumstances, we found a triable issue of material fact as to whether the agent misled the plaintiff, thus precluding summary judgment. (*Id.* at p. 1462.)

In *Butcher*, the plaintiff presented evidence that the agent not only failed to obtain the type of insurance he requested but also misled him as to the coverage he received. By contrast, appellant has not presented any evidence that she requested a certain type or amount of coverage or that Cappuccino misled her regarding the coverage she received. Rather, her own testimony is that she did not have any conversations with Joey about the adequacy of her coverage and did not ask for a specific amount, instead assuming the insurance would fully cover any loss. (See *Wallman*, *supra*, 200 Cal.App.4th at p. 1310 [finding no negligent failure to

13

procure agreed-upon coverage where, "by plaintiffs' own admissions their statements to [the insurance agent] about the kind of coverage they wanted were extremely general in nature"].)

Appellant relies on *Westrick v. State Farm Insurance* (1982) 137 Cal.App.3d 685 (*Westrick*), but we find *Westrick* distinguishable. There, the plaintiff previously had been told that his insurance policy contained a 30-day automatic coverage clause for a newly purchased truck, although he did not buy the vehicle at that time. Two months later, he bought two different trucks. When he called his insurance agent to secure insurance for the vehicles, he offered the agent the trucks' serial numbers and license information, but he was told that was not necessary. That night, one of the vehicles was involved in an accident, but it was not in fact insured. The agent did not recall ever telling the plaintiff about automatic coverage on the truck.

The trial court in *Westrick* entered a directed verdict on the plaintiff's negligence claim against the insurance company and insurance agent. The appellate court reversed, stating that "while an insurance agent who promises to procure insurance will indeed be liable for his negligent failure to do so [citations], it does not follow that he can avoid liability for foreseeable harm caused by his silence or inaction merely because he has not expressly promised to assume responsibility." (*Westrick*, *supra*, 137 Cal.App.3d at p. 691.) The court reasoned that a jury could find that the insured had been told a new vehicle would automatically be insured and so reasonably believed that his new trucks were insured. (*Id.* at p. 690.) The court further reasoned that a jury could find that the agent knew that the plaintiff sought to obtain insurance, but ignored the situation by declining to obtain the trucks' identification information and failing to tell the

14

insured about the specific policy provision that excluded the new vehicles from coverage. (*Ibid.*)

The plaintiff in *Westrick* thus presented evidence raising a triable issue of fact as to the insurance agent's knowledge of the coverage sought by the plaintiff and his failure to respond to the request. Unlike *Westrick*, appellant has not presented evidence sufficient to raise a triable issue of fact as to Cappuccino's knowledge of the extent of coverage she sought or its failure to obtain coverage for her.

Appellant has presented no evidence that Joey or Cappuccino ever did or said anything to make her believe that Cappuccino was an expert in homeowner's insurance or was assuming a special duty of care to her. (See *Wallman*, *supra*, 200 Cal.App.4th at p. 1312 ["Notably missing from [the insureds'] statements are *what* [the agent] said to give rise to the [insureds'] purported belief that he was an expert in insurance matters."].)

"To defeat summary adjudication, [appellant] could not rely on assertions that are 'conclusionary, argumentative or based on conjecture and speculation,' but rather [was] required to 'make an independent showing by a proper declaration or by reference to a deposition or another discovery product that there is sufficient proof of the matters alleged to raise a triable question of fact . . . .' [Citation.]" (*Roberts*, *supra*, 163 Cal.App.4th at p. 1404.) She presented no deposition of Joey or any other evidence to raise a triable issue of fact whether Cappuccino assumed a special duty of care. We therefore affirm the trial court's grant of summary judgment in favor of Cappuccino.

15

III.     *Claims Against Pacific Specialty*

    A.     *Breach of Contract*

Appellant contends that Pacific Specialty breached the contract by failing to pay her the additional $47,500 in coverage based on the 25 percent extended replacement cost coverage provision. She contends that Pacific Specialty erroneously relied on the replacement cost determined in the November 2011 appraisal to find that her home was not insured to its full replacement cost in denying the claim. The extended replacement cost provision states that the dwelling must be insured to its full replacement cost "at the time the policy is issued." Pacific Specialty has not submitted sufficient evidence of the replacement cost at the time the policy was issued to shift the burden to appellant to show a triable issue of fact as to that issue. (*Roberts*, *supra*, 163 Cal.App.4th at p. 1408.) Pacific Specialty thus has not established that it was entitled to summary judgment on the breach of contract claim.

The standard elements of a breach of contract claim are: (1) the existence of a contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) resulting damage to the plaintiff. (*Abdelhamid v. Fire Ins. Exchange* (2010) 182 Cal.App.4th 990, 999.) Pacific Specialty sought and obtained summary adjudication on appellant's breach of contract claim on the ground that she could not establish the third element, that Pacific Specialty breached the contract.

"An insurer may 'seek[] summary judgment on the ground the claim is excluded,' in which case it has 'the burden . . . to prove that the claim falls within an exclusion. [Citation.]' [Citation.]" (*Roberts*, *supra*, 163 Cal.App.4th at p. 1406.) If the insurer satisfies its initial burden, the burden shifts to the insured to "'show the existence of a triable issue of material fact on that issue. [Citation.]'

16

[Citation.]" (*Id.* at p. 1408.) ""The insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there is no coverage. [Citation.] . . ." [Citations.]'" (*Wallman*, *supra*, 200 Cal.App.4th at p. 1303.)

There is no dispute that appellant's premium payments always included payments for the extended replacement cost coverage. The endorsement addressing the Extended Replacement Cost Coverage provided as follows:

"In the event of a covered loss to your home, we will pay to repair or replace the damaged or destroyed dwelling with like or equivalent construction, *up to 25% over the policy's limits of liability*. Your policy will specify whether you must actually repair or replace the damaged or destroyed dwelling in order to recover extended replacement costs. The amount of recovery will be reduced by any deductible you have agreed to pay.

"To be eligible to recover extended replacement cost coverage, you must insure the dwelling to its *full replacement cost at the time the policy is issued*, with possible periodic increases in the amount of coverage to adjust for inflation. You must also notify us about any alterations that increase the value of the insured dwelling by a certain amount (see your policy for that amount). Read your declaration page to determine whether your policy includes coverage for building code upgrades." (Italics added.)

The "Conditions" section of the policy contained the following provisions:[9] "(1) If, *at the time of loss*, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately

---

[9] The "Conditions" section addressed the conditions for a settlement under appellant's regular coverage, not the extended replacement cost coverage. We set forth the language because Pacific Specialty apparently referred to similar language in its letter denying appellant's claim for extended replacement cost coverage.

17

before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:  [¶]  (a)  The limit of liability under this policy that applies to the building,  [¶]  (b)  The replacement cost of that part of the building damaged for like construction and use on the same premises; or  [¶]  (c)  The necessary amount actually spent to repair or replace the damaged building. . . .  [¶]  (2)  If, *at the time of loss*, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the actual cash value of that part of the building damaged, but not more than the limit of liability under this policy that applies to the building."  (Italics added.)

Pacific Specialty's January 2012 letter denying appellant's claim under the extended replacement cost coverage cited two different times at which the replacement cost was to be assessed, which appeared to be based on both provisions set forth above.  The letter initially stated that Pacific Specialty "must respectfully deny coverage under the Extended Replacement Cost endorsement because the home was not insured to its full replacement cost *immediately prior to the loss*."  (Italics added.)  The letter subsequently stated that "'to be eligible to recover extended replacement cost coverage, you must insure the dwelling to its full replacement cost *at the time the policy is issued*.'"  (Italics added.)

At the time the policy was issued in 2008, the policy stated that the estimated replacement cost was $171,000, and the insured value was $171,000.  At the time of the May 2010 renewal, the policy stated that the estimated replacement cost was $184,000, and the policy limit was $190,000.

18

Pacific Specialty argues that it was appellant's responsibility to ensure she had adequate coverage.[10] We do not disagree with this general principle. (See *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 660 ["It is up to the insured to determine whether he or she has sufficient coverage for his or her needs."] (*Everett*).) Nonetheless, Pacific Specialty does not address appellant's argument that the extended replacement cost provision required the home to be insured to its full replacement cost "at the time the policy is issued." Instead, Pacific Specialty relies on the replacement cost determined at the time of the November 2011 appraisal to argue that appellant did not have adequate coverage. Nor does Pacific Specialty offer any evidence that establishes that the dwelling was not insured to its full replacement cost at the time the policy was issued. On this record, we cannot say that Pacific Specialty has submitted sufficient evidence to shift the burden to the insured to show the existence of a triable issue of material fact on the issue. (*Roberts*, *supra*, 163 Cal.App.4th at p. 1408.)

Pacific Specialty argues that the November 2011 determination by the appraisal panel that the replacement cost was over $270,000 conclusively established the "full replacement cost" for purposes of the extended replacement cost provision. The appraisal, however, was in November 2011, almost a year after the fire, and a year-and-a-half after the policy was issued.[11] This replacement

---

**10** Pacific Specialty's argument that appellant admitted her dwelling was not insured to its full replacement cost at the time the policy was issued is specious. The record citations Pacific Specialty cites to support this contention do not support it.

**11** Pacific Specialty's own assessment of the "undisputed repair value" of the home in a March 2011 letter was $181,720.17, a figure lower than the estimated replacement cost in the policy and lower than the policy limit.

19

cost value accordingly is not pertinent to whether appellant's home was insured to its full replacement cost at the time the policy was issued.

Pacific Specialty also relies on the low cost of the extended replacement cost premium to argue that appellant could not reasonably have expected to be entitled to the coverage. However, "the insured's objectively reasonable expectations cannot ordinarily be gleaned from the premium cost alone. [Citation.]" (*Golden Eagle Ins. Co. v. Insurance Co. of the West* (2002) 99 Cal.App.4th 837, 849.) Appellant surely expected to receive some benefit from her payment of the extra premium for the 25 percent replacement cost coverage.

Pacific Specialty argues that appellant "completely remodeled" her home; however, the evidence Pacific Specialty relies on is too vague to satisfy its initial burden. (See *Roberts*, *supra*, 163 Cal.App.4th at pp. 1406, 1408 [if insurer satisfies its initial burden to show the claim is excluded, the burden shifts to the insured to show triable issue of fact].) The extended replacement cost coverage endorsement states that the insured "must also notify [Pacific Specialty] about any alterations that increase the value of the insured dwelling by a certain amount (see your policy for that amount)." Appellant acknowledged in her deposition that she remodeled her home prior to the fire.[12] However, other than the general statement that appellant remodeled her home at some unspecified time, Pacific Specialty has not provided any other evidence, such as the amount the alterations increased the value of the dwelling or the amount that would nullify the extended replacement cost coverage, to establish that there was no coverage under the extended replacement cost provision. (See *Wallman*, *supra*, 200 Cal.App.4th at p. 1303

---

[12]     We note that a page is missing from the deposition, such that it is impossible to tell when appellant actually remodeled her home. The cited excerpt also contains no evidence about the amount the alterations increased the value of the home.

["""The insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there is no coverage. [Citation.] . . ." [Citations.]'"].)

Pacific Specialty relies on *Minich v. Allstate Ins. Co.* (2011) 193 Cal.App.4th 477 (*Minich*), to support its position, but *Minich* is distinguishable. The policy in *Minich* provided that the insurer would pay the insureds "the 'actual cash value' of their house, in an amount not to exceed the 'limit of liability shown on the Policy Declarations,' if the house were damaged or destroyed." (*Id.* at p. 479.) A "Building Structure Reimbursement" provision provided for a payment in excess of the actual cash value *if* the insureds were to "repair, rebuild or replace" their house. (*Ibid.*) After the house was destroyed by a fire, the insurer paid the limit of liability, but it refused to pay the additional amount until the insureds provided evidence that they were in fact rebuilding their house. After the insureds provided the insurance company with building permits, informed the insurer that the foundation had been completed, and the insurer confirmed this information, the insurer paid the amount provided for in the building structure reimbursement provision.

The insureds in *Minich* argued that they reasonably believed the building structure reimbursement provision extended their policy limit, without regard to whether they rebuilt their house. The court relied on Insurance Code section 10102 in reasoning that the provision did not increase the policy's limit on liability. (*Minich*, *supra*, 193 Cal.App.4th at pp. 489-490.)

Unlike in *Minich*, appellant does not claim that the extended replacement cost coverage *increased* her policy limit. Rather, appellant's claim is consistent with the court's observation in *Minich* that extended replacement cost coverage is

21

defined as a specified percentage *above* the policy limit, not an increase in the policy limit itself. (*Minich*, *supra*, 193 Cal.App.4th at p. 490.)

Pacific Specialty's reliance on *Everett* is unavailing because the policy provision there differed from that at issue here. The policy in *Everett* contained a replacement cost provision that stated that the insurer "'will pay *up to the applicable limit of liability shown in the Declarations*, the reasonable and necessary cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under Section I – Coverages, Coverage A – Dwelling.'" (*Everett*, *supra*, 162 Cal.App.4th at p. 657.) The replacement cost provision in *Everett* accordingly was limited to the policy's limit of liability. Here, by contrast, the extended replacement cost provision stated that Pacific Specialty "will pay to repair or replace the damaged or destroyed dwelling with like or equivalent construction, *up to 25% over the policy's limits of liability*." (Italics added.)

In *Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110 (*Desai*), the insurance agent told the plaintiff his policy provided 100 percent coverage for the cost of repairing or replacing improvements to real property, as requested. After two structures were destroyed, the insurance company relied on language in the policy that it was responsible for the smaller of either the replacement costs or the limit of liability under the policy. The plaintiff's loss was $546,757, but the policy limit was $150,000. The insured agreed to pay $158,734 on the ground that this was the limit of its liability.

On appeal, the court relied on a "Value Protection Clause" in the policy, which provided "'automatic protection against inflation so that the coverage amounts are increased as the costs of replacing your home or Personal Property increase.'" (*Desai*, *supra*, 47 Cal.App.4th at p. 1116, italics deleted.) The court

22

reasoned that "[a] reasonable policyholder could readily construe that to mean that he or she need not demand increased coverage each year because Farmers would 'automatically' take increased costs into account in fixing the coverage and premium." (*Id.* at pp. 1117-1118.) The court concluded that "an objectively reasonable insured layperson would believe the policy guaranteed replacement coverage, regardless of what the purported policy limits were," and that the trial court erred in construing the policy in the insurer's favor and in sustaining the insurer's demurrer to the breach of contract cause of action. (*Id.* at p. 1118.)

Here, the extended replacement cost coverage promised payment for repair or replacement "up to 25% over the policy's limits of liability" if the dwelling was insured "to its full replacement cost at the time the policy is issued, with possible periodic increases in the amount of coverage to adjust for inflation." Appellant presented evidence that the home was insured to its full replacement cost in 2008 and at the time of the May 2010 renewal. She paid the premium, with adjustments for inflation, and her policy limit and estimated replacement cost in the policy were adjusted for inflation. Similar to *Desai*, an objectively reasonable insured layperson would believe the policy guaranteed the 25 percent payment over the policy's limits of liability.

The fact that the replacement cost value of the home was determined to be $273,813.04 by the appraisal panel in November 2011, nearly a year after the fire, does not establish that the home was not insured to its full replacement cost at the time the policy was issued, as required by the endorsement for the extended replacement cost coverage. Pacific Specialty has not presented evidence that the home was not insured to its full replacement value at the time the policy was issued sufficient to shift the burden to appellant. (*Roberts*, *supra*, 163 Cal.App.4th at p. 1408.) In fact, in its brief, Pacific Specialty does not address the phrase, "at the

23

time the policy is issued," when it discusses appellant's obligation under the endorsement. We therefore reverse the grant of summary judgment in favor of Pacific Specialty on appellant's breach of contract claim.

B.    *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Appellant contends that the trial court erred in granting summary judgment in favor of Pacific Specialty on her claim for breach of the implied covenant of good faith and fair dealing because Pacific Specialty has failed to establish that its withholding of benefits was legitimate.[13]

"'The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing. "The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits. To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.'" [Citation.] Thus, '[a]n insurer's obligations under the implied covenant of good faith and fair dealing with respect to first party coverage include a duty not to unreasonably withhold benefits due under the policy. [Citation.] An insurer that unreasonably delays, or fails to pay,

---

[13]    We acknowledge Pacific Specialty's argument that appellant failed to provide citations to the record in the section of her brief addressing this claim. Nonetheless, we exercise our discretion to "[d]isregard the noncompliance" pursuant to California Rules of Court, rule 8.204(e)(2)(C), because we have already examined the record in the breach of contract claim, and many of the same facts support the bad faith claim. We further note that we disagree with Pacific Specialty's contention that appellant did not fully make this argument in the trial court. Appellant's opposition to Pacific Specialty's summary judgment motion raised the issues she raises on appeal as to this claim – that is, that Pacific Specialty improperly delayed resolution of the claim and improperly denied benefits under the extended replacement cost provision.

24

benefits due under the policy may be  held liable in tort for breach of the implied covenant.  [Citation.]'  [Citation.]" (*Maslo v. Ameriprise Auto & Home Ins.* (2014) 227 Cal.App.4th 626, 633 (*Maslo*).)

"An insurer is said to act in 'bad faith' when it breaches its duty to deal 'fairly' and 'in good faith' with its insured.  [Citation.]  The term 'bad faith' does not connote 'positive misconduct of a malicious or immoral nature' [citation]; it simply means the insurer acted deliberately." (*Major*, *supra*, 169 Cal.App.4th at p. 1209.)  "[A]n insured plaintiff need only show, for example, that the insurer unreasonably refused to pay benefits or failed to accept a reasonable settlement offer; there is no requirement to establish *subjective* bad faith.  [Citations.]" (*Bosetti v. United States Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1236 (*Bosetti*).)

"[T]o establish the insurer's 'bad faith' liability, the insured must show that the insurer has (1) withheld benefits due under the policy, and (2) that such withholding was 'unreasonable' or 'without proper cause.'  [Citation.]  The actionable withholding of benefits may consist of the denial of benefits due [citation]; paying less than due [citation]; and/or unreasonably delaying payments due [citation]." (*Major*, *supra*, 169 Cal.App.4th at p. 1209.)

Pacific Specialty relies on the "genuine issue" or "genuine dispute" doctrine, which "enables an insurer to obtain summary adjudication of a bad faith cause of action by establishing that its denial of coverage, even if ultimately erroneous and a breach of contract, was due to a genuine dispute with its insured.  [Citation.]" (*Bosetti*, *supra*, 175 Cal.App.4th at p. 1237.)  In order to rely on this doctrine, "[t]he dispute, however, must be *genuine*.  An insurer cannot claim the benefit of the genuine dispute doctrine based on an investigation or evaluation of the insured's claim that is not full, fair and thorough.  [Citation.]" (*Ibid.*)

Moreover, to be entitled to summary judgment pursuant to the genuine issue rule in the context of bad faith claims, it must be "'undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable . . . . [Citation.] . . . On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.' [Citation.] Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues (Code Civ. Proc., § 437c, subd. (c)) as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith." (*Wilson*, *supra*, 42 Cal.4th at p. 724.)

Applying these principles, we conclude that appellant has presented evidence sufficient to raise a triable issue of fact as to whether Pacific Specialty acted in bad faith in processing her claim. As discussed above, Pacific Specialty has essentially ignored the requirement in the endorsement that the dwelling be insured to its full replacement cost *at the time the policy was issued*, relying instead on the estimated replacement cost at the time of the November 2011 appraisal. In addition, its letter to appellant denying her claim for extended replacement cost coverage gave as reasons both that "the home was not insured to its full replacement cost immediately prior to the loss," and that the home was not insured to its full replacement cost at the time the policy was issued, raising a question of the actual basis for Pacific Specialty's denial of the claim.

Appellant also presented evidence that Pacific Specialty initially estimated the repair cost to be $181,720.17, and therefore based her payment on that amount, rather than the $190,000 policy limit. Only after appellant invoked the policy's appraisal clause and paid for an appraisal did Pacific Specialty pay the additional

26

amount to reach the $190,000 policy limit. Then, when it was confronted with appellant's claim under the extended replacement cost coverage, Pacific Specialty decided to rely on the appraisal panel's determination of an estimated replacement cost over $270,000 to deny the claim.

Given these facts, a reasonable jury could find that Pacific Specialty acted unreasonably in its dealings with appellant. (See *Maslo*, *supra*, 227 Cal.App.4th at p. 634 [concluding the insured stated an insurance bad faith cause of action where the insurer rejected a demand for payment without an adequate investigation, made no offer of settlement despite clear evidence of liability, and agreed to pay the claim only after arbitration]; *Wilson*, *supra*, 42 Cal.4th at p. 721 [affirming denial of summary judgment of insurance bad faith claim where insurer's claims examiner rejected insured's treating physician's medical conclusion with no medical basis for doing so].) If believed by the jury, the evidence that Pacific Specialty relied on a low replacement cost to initially offer appellant a settlement below her policy limit, then relied on a higher replacement cost estimate to deny her extended replacement cost coverage, could support a finding that Pacific Specialty acted in bad faith. Moreover, appellant's evidence that Pacific Specialty relied on the estimated replacement cost a year after the fire to deny her extended replacement cost coverage, in contravention of the language in the policy, raises a triable issue "as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith." (*Wilson*, *supra*, 42 Cal.4th at p. 724.)

"If an insurer is to avoid liability for bad faith, its actions and position with respect to the claim of an insured, and the delay or denial of policy benefits, must be 'founded on a basis that is *reasonable under all the circumstances*.' [Citation.]" (*Bosetti*, *supra*, 175 Cal.App.4th at p. 1237.) The evidence presented by appellant

raises a triable issue of material fact whether Pacific Specialty's delay in paying up to the policy limit and its denial of the extended replacement cost coverage was objectively reasonable. We therefore reverse the grant of summary judgment in favor of Pacific Specialty on the bad faith cause of action.

## DISPOSITION

The judgment in favor of Cappuccino is affirmed. The judgment in favor of Pacific Specialty is reversed and the matter remanded for further proceedings. Cappuccino is entitled to costs on appeal. As to the causes of action against Pacific Specialty, each party is to bear its own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, Acting P. J.

We concur:

MANELLA, J.

COLLINS, J.

28