Filed 11/24/20  Worden v. Farmers Fire Ins. Exchange CA1/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STEPHEN F. WORDEN,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>FARMERS FIRE INSURANCE EXCHANGE et al.,<br><br>        Defendants and Respondents. | A156876<br><br>(Sonoma County<br>Super. Ct. No. SCV-26123) |

After Stephen F. Worden's second home at Sea Ranch suffered serious fire damage, he learned the cost to rebuild exceeded the limits of his property insurance.  He filed the instant action against his insurance company and agent, alleging they breached a duty to ensure that he had full replacement cost coverage.  The trial court ruled defendants owed Worden no such duty and granted their motion for summary judgment.  We affirm.

### BACKGROUND

Worden built a second home at Sea Ranch in 1972. Almost 44 years later, in 2016, the back half of the house burned, resulting in extensive damage.  Worden consulted a local contractor who told him rebuilding would cost approximately $663,000 to $688,500.  Worden's insurer,

1

Farmers Insurance Exchange, paid out his policy limits—totaling $339,577.[1] Worden sued, claiming his insurance agents and Farmers owed him a duty to ensure the policy limits would cover full replacement cost.

### The Operative Complaint

Worden eventually filed a second amended complaint alleging causes of action for negligent failure "to obtain adequate insurance" coverage and for negligent misrepresentation as to the adequacy of the coverage on the Sea Ranch home.[2]  (Capitalization omitted.)

In connection with both causes of action, Worden alleged he had a "long term special relationship" with Matthew Hague Insurance Agency—initially obtaining an insurance policy through Matthew Hague's father, and after he passed away, continuing to procure insurance through Matthew.  Worden claimed he "specifically requested that Hague provide adequate insurance coverage" for his Sea Ranch home, that Hague both "assured [him] that he would always obtain adequate insurance coverage for his needs" and "held himself out as an expert regarding appropriate insurance coverage for Worden's needs," and as a result, Worden "relied on Hague to procure adequate insurance coverage for his needs."  Worden maintained he had "no experience or knowledge whatsoever regarding the cost of replacement" and "totally relied" on defendants "to obtain adequate fire insurance coverage in the event of a fire."  Worden further asserted defendants had a "duty to review the coverage annually to determine if it was adequate."

---

[1]  This included $261,000 for the "Coverage A—Dwelling" limit, $13,050 for the "Coverage A—Debris Removal" limit, and $65,527.89 "for the debris removal estimated cost up to Mr. Worden's Extended Replacement Cost policy limits of $65,250 plus his additional Coverage B debris removal limits."

[2]  Worden also alleged, but later abandoned, a cause of action for reformation of contract.

***The Motion for Summary Judgment***

***Defendants' Motion***

Defendants moved for summary judgment on the ground they did not owe Worden a legal duty "to recommend that he increase his policy limits" and they "did not misrepresent the nature of [his] coverage," but rather "maintained the insurance coverage Plaintiff requested."

The motion was supported by copies of the "[r]enewal [o]ffers" made between 2007 and 2016.[3] The offers consisted of a packet of documents, including (a) a summary of the premium charges, (b) a "Declaration Page" with an exceedingly brief description of the property and a summary of the coverages, including the "Property" coverages, (c) a number of "Policy Endorsements," (d) a number of "Policy Notices," and (e) an "Exchange Update." Defendants also submitted excerpts of Worden's deposition testimony, as well as a declaration by Hague.

*Policy.* The "Declaration Page" of the 2016 "Renewal Offer" of the policy in effect at the time of the fire identified the limits for each of the coverages, including "Property Coverage," which, for the dwelling, totaled $326,250.

The first three pages of the 2016 "Policy Notices" consisted of a "California Residential Property Insurance Disclosure." The first page of the disclosure listed and defined the "Primary Forms of Residential Dwellings

---

[3] Neither party had a copy of the original policy. And neither party could identify when the policy was changed from a standard homeowner's policy to a commercial landlord policy. When Worden built the small, pre-fabricated house, (he did so, himself, at a cost of about $50,000), he anticipated using it in part as a rental. The policy had already been changed to a landlord policy by the time Hague took over from his father as Worden's agent. The dwelling insurance provisions and limits, in any case, remained the same.

Coverage"—"Actual Cash Value Coverage" (described as "the most limited level of coverage"), "Replacement Cost Coverage," "Extended Replacement Cost Coverage," "Guaranteed Replacement Cost Coverage"[4] (described as "the broadest level of coverage"), and "Building Code Upgrade Coverage." The first page also identified the coverage Worden had—"Extended Replacement Cost Coverage"[5] and "Building Code Upgrade Coverage."[6] Thus, the first

---

[4] "Guaranteed Replacement Cost Coverage" is coverage that "covers the full cost to repair or replace the damaged or destroyed dwelling for a covered peril regardless of the dwelling limits shown on the policy declarations page."

[5] "Extended Replacement Cost Coverage" is "intended to provide for the cost to repair or replace the damaged or destroyed dwelling without a deduction for physical depreciation. Many policies pay only the dwelling's actual cash value until the insured has actually begun or completed repairs or reconstruction on the dwelling. Extended Replacement Cost provides additional coverage above the dwelling limits up to a stated percentage or specific dollar amount. See your policy for the additional coverage that applies."

The policy further explained in the Policy Notice pertaining to dwelling reconstruction, that "[w]ith [Extended Replacement Cost Coverage] coverage and subject to its provisions, we pay to repair or replace damage from a loss under Coverage A up to an additional 25% or 50% of the Coverage A amount, depending on which percentage options, if any, are available in your state for your policy form. If your policy does not have this coverage, or if a higher coverage limit is available, you may consider adding or increasing this coverage for an additional premium. This coverage may provide an additional layer of protection as *your policy does not provide Guaranteed Replacement Cost coverage*."

[6] "Building Code Upgrade Coverage . . . covers additional costs to repair or replace a dwelling to comply with the building codes and zoning laws in effect at the time of loss or rebuilding. These costs may otherwise be excluded by your policy. Meeting current building code requirements can add significant costs to rebuilding your home. Refer to your policy or endorsement for the specific coverage provided and coverage limits that apply."

4

page of the disclosure (as well as the Policy Notice concerning reconstruction cost) notified Worden he did *not* have "Guaranteed Replacement Cost Coverage," and thus was *not* covered for "the full cost to repair or replace the damaged or destroyed dwelling" and was insured for replacement only to the extent of the policy limits.

Immediately under the list of the primary forms of coverage, the first page of the residential disclosure also warned about the peril of being underinsured. On the second page, the disclosure stated the coverage limit should be high enough so the dwelling could be rebuilt and further advised obtaining a rebuilding estimate "based on construction costs in your area."[7]

The Policy Notices also included a notice about "Reconstruction Cost and Your Coverage A (Dwelling) Amount," which urged the insured to "review this information carefully." The notice commenced with the heading, "Do You Think You Have Enough Coverage?" (Italics omitted.) There followed an explanation stating: "When you first obtained your policy, Farmers[] used an estimating program to calculate a reconstruction cost estimate for you home. This was an estimate, not a guarantee of reconstruction costs." The new renewal limit was then listed, $261,000. The warning went on to state: "It's important to understand that reconstruction cost is NOT the same as the market value of your home" and defined both terms. It also directed Worden's attention to the "information" about the

---

[7] As is required by statute, the Policy Notices for prior years, "on an every-other-year basis," contained similar residential property insurance disclosures. (Ins. Code, § 10102, subd. (d) ["Following the issuance of the policy of residential property insurance, the insurer shall provide the [residential property insurance] disclosure statement to the insured on an every-other-year basis at the time of renewal.].) Accordingly, the disclosure was provided in the Policy Notices for 2008, 2010, 2012, 2014, and 2016.

home section on the following page and asked that he advise Hague if any changes were required to ensure the description was correct.[8]

*Worden's Deposition.* Worden testified that when he originally procured coverage for the Sea Ranch property, Hague's father did not inspect the home, but rather "took the information" Worden provided him "about the house, the construction, what it was constructed of, the size, what was included in it and then he gave me the offer of the policy." The first year, and every year thereafter, Worden "reviewed that policy and reviewed the limits." As far as he could tell, the policy limits "were correct." Worden did not recall what his original policy limits were, or what the limits were when Hague took over from his father as Worden's agent. Nevertheless, Worden claimed the original policy limits were "right on the money."

Worden continued his annual review when Hague took over as his agent. Hague "would say the limits, the cost would go up because it had built into the policy was a—I don't know what you call it. Uhm, due to construction costs and the market going up, these limits would go up," which he understood was "due to inflation."

Worden admitted that from the time the Sea Ranch home was first insured, until it burned, Worden never "sp[oke] with anyone" from the Hague agency "about [his] insurance policy limits." He also admitted that he never asked Hague to inspect the property or obtained a replacement cost estimate himself.

After the fire, Worden consulted a "local real estate person" and a "local contractor," both of whom told him "to replace the house as it was would be in the neighborhood of around $600,000 dollars."

---

[8] The policy notices for prior years contained similar reconstruction cost advisements.

Worden filed suit because he had "assumed" Hague and Farmers "were the one[s] responsible for keeping me up to date on the, what I should be insured up to." He did not believe Hague "intentionally misled" him, but according to Worden, Hague had told him the policy was "adequate coverage," which was the "wrong information" given that the property "was only insured up to—what is it, only insured up to 326,000 dollars."

*Hague's Declaration.* Hague averred that Worden "never asked for '100% replacement cost' coverage,'" never asked him "how the replacement cost was calculated," never asked him "to recalculate the replacement cost[s]" for the Sea Ranch home, never asked him "to inspect his property," and never gave him "a specific dollar amount that he believed it would cost to repair his property if it were completely damaged." Farmers, on Hague's behalf, sent Worden an annual "renewal offer," which reminded Worden to review his coverages and limits, update or increase his limits as appropriate, and ask his agent for a review of his policy—none of which Worden did.

### Plaintiff's Opposition

In his opposition, Worden acknowledged that in general, insurance agents and insurance companies owe no duty to volunteer that an insured "should procure additional or different insurance coverage." He maintained, however, this was not a case of a failure to recommend additional coverage but rather, a case of "failure to deliver the agreed upon coverage."[9]

### Defendants' Reply

In reply, defendants maintained that, contrary to Worden's characterization of his claim in his opposition as a "failure to deliver the

---

[9] Worden also submitted a declaration from Bennett Bibel, the president of a corporation "which acts as insurance analysts, counselors, consultants, and risk managers." Bibel proffered several opinions, to which defendants interposed multiple objections, which the trial court sustained.

agreed upon coverage," the case had been pled as a " 'failure to recommend adequate coverage' case." They asserted they "owed no duty to Plaintiff as a matter of law to recommend higher policy limits, to increase his policy limits, or to advise him regarding the sufficiency of his limits." They further maintained Worden's negligent misrepresentation claim failed because Worden "cannot prove there was a misrepresentation."

### *Trial Court's Ruling*

The trial court ruled defendants "did not owe a legal duty to Plaintiff to recommend that he increase his insurance policy limits," the proffered evidence was insufficient to show a heightened duty to recommend higher policy limits, and defendants "did not misrepresent the nature of Plaintiff's coverage."

With respect to the negligence claim, the court pointed out Worden admitted his insurance was adequate when procured, but, was complaining that it became inadequate over the course of 44 years. Hague "did not," however, "owe Plaintiff a duty of care to make unsolicited recommendations about Plaintiff's policy limits," which Worden himself admitted he reviewed and "continued to accept the coverage as written. This is not an instance in which Plaintiff ever requested 100% replacement coverage or even an increase in policy limits. Rather, Plaintiff here admits he just assumed the

---

Worden has not challenged any of the court's rulings and thus has waived any evidentiary issue on appeal. (See *Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014–1015 [Where a plaintiff does not challenge the superior court's ruling sustaining a moving defendant's objections to evidence offered in opposition to the summary judgment motion, "any issues concerning the correctness of the trial court's evidentiary rulings have been waived. [Citations.] We therefore consider all such evidence to have been "properly excluded."].) Because the court's rulings stripped Bibel's declaration of any significant substance, we do not discuss it further.

policy limits were adequate, never conducted any assessment of rebuilding costs as specifically recommended in the notices of policy renewal and never requested that Hague inspect the property."

The court also ruled the length of Worden's insurance relationship with the Hagues was "insufficient to establish a heightened duty" and that Worden had failed to raise any issue of material fact that Hague had "held himself out as an expert on the cost of rebuilding the home." Nor, said the court, was there any heightened duty "to respond to his special inquires," a claim Worden "[did] not allege" in his second amended complaint and which he claimed was supported because a "few times before 2016 he told Hague that the description of the home was erroneous in identifying the construction material." Even assuming Worden had asked Hague's father to correct several errors in the description of the home—such as that the siding material was masonry (when, in fact, it was wood), that there were two (rather than three) stories, and that there was a concrete slab (rather than a concrete foundation)—and further assuming this "was 'a request or inquiry by the insured for a particular type or extent of coverage,' it fail[ed] to support a heightened duty of care."

As for the negligent misrepresentation cause of action, the court ruled Worden's allegation that Hague "negligently misrepresented to him that he would obtain adequate insurance coverage" was "too vague to constitute actionable negligence." Furthermore, there was "no evidence of any misrepresentation," rather, it appeared Hague gave an "accurate representation of how the policy limits were automatically increased each year to account for inflation."

9

DISCUSSION[10]

***Negligence***

*Worden's Recasting of His Claim*

As we have recited, in his second amended complaint—the operative pleading—Worden alleged defendants failed "to obtain *adequate insurance coverage*" (italics added, capitalization omitted) and failed to "conduct an annual review . . . to *adequately* insure" the property. (Italics added.) As defendants point out, these allegations trigger a line of cases resolved under the general rule that insurers and their agents do not have a duty to ensure that a policy will cover the full amount of any insured loss. (E.g., *Fitzpatrick v. Hayes* (1997) 57 Cal.App.4th 916, 921–923 (*Fitzpatrick*) [canvassing this authority in detail].)

As we have also recited, in his opposition to defendants' motion for summary judgment, Worden re-characterized his claim as one for "failure to deliver the agreed upon coverage"—a re-characterization he continues to make on appeal. Such a claim triggers a line of cases finding "exceptions" to general no-duty rule. (*Fitzpatrick, supra,* 57 Cal.App.4th at pp. 923–927 [also canvassing this authority in detail].)

Pointing to the well-established rule that a motion for summary judgment is directed at the claims alleged in the operative pleading and need not anticipate new and different claims (e.g. *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1253, 1257–1258 & fn. 7 [The operative

---

**10** The standard of review on appeal from a summary judgment is well-established. We review the judgment de novo (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334), and in doing so, we " 'liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286.)

10

complaint determines the issues a defendant must address to prevail on a motion for summary judgment, and a party cannot amend its pleadings by raising issues for the first time in an opposition to summary judgment. "To allow an issue that has not been pled to be raised in opposition to a motion for summary judgment in the absence of an amended pleading, allows nothing more than a moving target."]), defendants insist Worden's restyled claim fails as a matter of law.

However, we need not decide whether Worden transgressed into unfair revisionist territory. Regardless of any reimagining, on this record, Worden's negligence claim fails.

### *Defendants Owed No Duty to Ensure Worden Had Coverage for Full Replacement Cost*

"Ordinarily, an insurance agent 'assumes only those duties normally found in any agency relationship. This includes the obligation to use reasonable care, diligence, and judgment in procuring the insurance requested by an insured. [Citation.] The mere existence of such a relationship imposes no duty on the agent to advise the insured on specific insurance matters. [Citations.]' [Citation.] Instead, in the ordinary case, 'the onus is . . . squarely on the insured to inform the agent of the insurance he requires.' (*Paper Savers, Inc. v. Nacsa* (1996) 51 Cal.App.4th 1090, 1096 . . . [*Paper Savers*].)" (*Wallman v. Suddock* (2011) 200 Cal.App.4th 1288, 1309 (*Wallman*).)

Accordingly, the courts have uniformly rejected the assertion that insurers and their agents owe a "duty" to ensure that a policy will provide full coverage for an insured loss. (See *Fitzpatrick, supra,* 57 Cal.App.4th at pp. 921–923, 926–927.)

11

In *Gibson v. Government Employees Ins. Co.* (1984) 162 Cal.App.3d 441 (*Gibson*), for example, the plaintiff insureds sought to recover from their insurer for "unreimbursed damages they suffered" after being struck by an automobile while crossing the street. (*Id.* at pp. 443–444.) They alleged they had obtained insurance from the defendant for over 20 years, had been " 'assured that defendant . . . would cover their needs,' " and had relied upon the defendant to provide " 'the coverage necessary for their protection, and to inform plaintiffs of such coverage and needs.' " (*Id.* at pp. 443, 448.) They further asserted the defendant had failed to inform them of "the availability of coverage in addition to that requested" and "the inadequacy of their policy limits." (*Id.* at p. 443.) The trial court dismissed the complaint. The Court of Appeal affirmed. (*Id.* at pp. 443, 453.)

There was nothing in the allegations, the appellate court explained, "concerning any promises, guarantees, or warranties made by defendant, through advertising or otherwise, that defendant would 'obtain comprehensive and adequate insurance for plaintiffs,' that defendant 'held itself to have a great deal of authority in the matter,' or that plaintiff . . . 'was persuaded to go with defendant by defendant's promises of comprehensive insurance protection.' " (*Gibson, supra*, 162 Cal.App.3d at p. 448.) "[A]bsent some conduct on the part of the insurer consistent with assuming broader duties," the general duty owed by an insurer did not include a duty to advise on optimum coverage amounts, or types of insurance available on the general market, or to warn when coverage is too low. (*Id.* at pp. 443, 452; see *Ahern v. Dillenback* (1991) 1 Cal.App.4th 36, 42–43 [insurance agent had no duty to procure additional or different insurance coverage than that requested by the insured].)

12

In *Jones v. Grewe* (1987) 189 Cal.App.3d 950 (*Jones*), a minor fell into an apartment swimming pool and sustained serious injuries. The property owners, after settling with the minor's parents, sued the insurance brokers through whom they had procured liability insurance. They alleged the brokers had failed to "provide appellants with liability insurance sufficient to protect their personal assets and satisfy the $1.5 million judgment"; had "held themselves out as insurance consultants and experts;" had "taken care of appellants' insurance needs for 10 years, during which time appellants relied on respondents' expertise;" and had " 'expressly and impliedly' represented to appellants that their insurance protection was adequate." (*Id.* at p. 953.) The brokers interposed demurrers, asserting "they did not have a duty to provide appellants with liability insurance sufficient to 'cover every conceivable eventuality.' " (*Ibid.*) The trial court agreed, and the Court of Appeal affirmed. (*Id.* at p. 957.)

The "general duty of reasonable care which an insurance agent owes his client," said the appellate court, "does not include the obligation to procure a policy affording the client complete liability protection." (*Jones, supra*, 189 Cal.App.3d at p. 956.) The court further concluded no facts were alleged "from which a special or greater duty could reasonably be inferred." (*Ibid.*) Rather, the complaint alleged the owners had "purchased insurance from an insurance agent for several years and followed his advice on certain insurance matters," the brokers had "assured appellants of the adequacy of their liability coverage," and " 'financial information' regarding appellants was made available to respondents.' " (*Id.* at pp. 956–957.) These allegations, both singularly and collectively, were not sufficient "to imply the existence of a greater duty." (*Id.* at p. 957.)

In *Fitzpatrick, supra,* 57 Cal.App.4th 916, the plaintiffs alleged their insurance company and one of its agents negligently failed to advise them of "the availability of personal umbrella coverage which . . . would have resulted in their being more adequately compensated for the injuries they suffered" as a result of a car accident with an underinsured driver. (*Id.* at p. 918.) The trial court granted the defendants' motion for summary judgment on the ground that " 'none of the defendants had a duty to advise plaintiffs of the availability of, and to procure, excess underinsured motor vehicle coverage, and none of the defendants undertook such a duty.' " (*Id.* at p. 920.) The Court of Appeal affirmed. (*Id.* at p. 930.)

As we have indicated, the appellate court undertook an exhaustive discussion of the cases resolved under the general rule—that insurers and agents have no duty to procure any particular kind or amount of coverage— and those resolved under exceptions to that rule, wherein the courts found, under the particular facts of the case, a heightened duty to deliver a policy containing specifically requested coverage or limits. (*Fitzpatrick, supra,* 57 Cal.App.4th at pp. 921–927.) The court summarized the latter cases as falling into three categories—where the agent misrepresents the "nature, extent, or scope of the coverage being offered or provided"; the insured requests "a particular type or extent of coverage"; or the agent assumes "an additional duty" by expressly " 'holding himself out' as having expertise in a given field of insurance sought by the insured." (*Id.* at p. 927.)

The underinsured plaintiffs in *Fitzpatrick* asserted two of these exceptions applied—that they had requested or inquired about a particular type or extent of coverage, and their agent had assumed an additional duty by holding himself out as having expertise in the area of personal insurance needs. (*Fitzpatrick, supra,* 57 Cal.App.4th at p. 927.) As support, they

14

pointed out their insurance agent had renewed their policies for 20 years, was aware they "generally wanted the upper limits of coverage," was aware the insurance company offered umbrella coverage, and told them " 'several times' " their insurance coverage was adequate. (*Id.* at pp. 927–928.) They also relied on a State Farm brochure promoting " a 'Family Insurance Checkup' " and a declaration by a former agent that failing to alert the plaintiffs of their need for an umbrella policy was a failure to act " 'within the standards of care applicable to State Farm agents.' " (*Id.* at p. 929.) None of this, said the court, raised a triable issue that the case fell outside the general rule. The "adequate" statement was conclusory and also lacked reference to any sort of specific inquiry by the insureds. (*Id.* at pp. 928–929.) As for the brochure, there was no evidence the plaintiffs saw or relied on it. Further, "even a cursory reading of that brochure makes clear that it is far from a 'holding out' of special expertise." (*Id.* at p. 929.) Finally, the former agent's declaration went towards breach, and did not bear on whether defendants legally owed a special duty of care. (*Ibid.* ["the responsibility for defining duty in a tort case reposes with the court"].)

Insisting this is "a failure to deliver the agreed-upon coverage case, not a failure . . . to recommend adequate coverage" case, (italics omitted), Worden relies on *Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110 (*Desai*) and like cases to support his assertion the trial court erred in granting summary judgment.

In *Desai*, the insured alleged he had specifically requested "100 percent coverage for the cost of repairing or replacing improvements to the property, including any increase for inflation" and the insurance agent had "personally inspected the property to determine the amount of coverage needed" and then "orally represented that the policy provided '100 coverage for costs of repairs

15

and/or replacement of the improvements to the property including any and all increases in costs of repair or rebuilding in the event of a loss.' " (*Desai, supra*, 47 Cal.App.4th at p. 1114.) The trial court sustained the defendants' demurrer without leave to amend and entered a judgment of dismissal. The Court of Appeal reversed. (*Id.* at pp. 1114–1115.)

As the appellate court explained, as alleged in the complaint, this was "not a situation wherein an insured belatedly realized—after an accident occurred and a claim was made and denied—that he or she should have had more or different coverage." (*Desai, supra*, 47 Cal.App.4th at p. 1119.) Rather, it was a case where the insured allegedly had made a specific request for coverage for full repair and replacement cost, and the agent had personally inspected the property in order to deliver the requested coverage and thereafter had specifically represented the policy was a "100 percent coverage" policy. (*Id.* at pp. 1114, 1119; see *Fitzpatrick, supra,* 57 Cal.App.4th at pp. 926–927 [discussing the cases, such as *Desai*, where the courts have found "exceptions" to the general rule that an agent "does not have a duty to volunteer to an insured that the latter should procure additional or different insurance coverage"].)

Worden claims the instant case not only comes within the "exception" to the general rule illustrated by *Desai* and similar cases—where the insured makes a specific request for specific coverage—but also comes within the other two "exceptions" identified in *Fitzpatrick*—where the agent "misrepresents" the "nature, extent or scope of the coverage being offered or provided," or expressly " 'hold[s] himself out' as having expertise in a given field of insurance sought by the insured." (*Fitzpatrick, supra,* 57 Cal.App.4th at p. 927.)

16

In support, Worden asserts: (a) he requested a homeowners' insurance policy, (b) he did not know—before his deposition—the policy had been changed to a landlord policy, (c) he relied on Hague's father to know "the current market value" of the Sea Ranch home[11]; (d) he provided Hague's father with information regarding the size and construction materials of the home; (e) the original estimate in 1972 "was right on the money" and "adequate," (f) he had yearly meetings with Hague's father and Hague; (g) when Hague inherited the policy, he "would tell Worden that . . . 'the cost would go up because it had been built into the policy . . . due to construction costs and the market going up, those limits would go up,' " (h) when Worden annually reviewed the policy limits he "assumed that the coverage had gone up approximately the correct percentage," (i) the home description was wrong in some respects, and had Hague corrected the errors in the description "there would likely have been an evaluation of the current cost of reconstruction of this unique home with redwood siding," and (j) Hague misrepresented, though not intentionally, that Worden had "adequate coverage."

None of these assertions removes the instant case from the general rule and establishes that the Hagues assumed a special duty of care to assure that Worden had full replacement coverage.

Hague averred in his declaration that he inherited Worden's policy when he took over his father's business. He never assisted Worden in "obtaining any new insurance policies." Worden never asked him to review or adjust his policy limits, never asked for " '100% replacement cost' coverage" (even though this was identified bi-annually in the renewal packets as the

[11] We note the Policy Notices also made clear "market value" is not the same as, and "is almost always different from," replacement cost.

"broadest level of coverage" and *the* form of coverage that provided full replacement cost), never asked for an inspection of the Sea Ranch home (even though this was one of the recommendations in the renewal packets to protect against being underinsured), and never asked or arranged for a current estimate to rebuild (even though this was also one of the recommendations in the renewal packets to protect against being underinsured.

Nothing in Worden's complaint or, more importantly, his deposition testimony, is to the contrary. In fact, Worden both alleged and testified that the only affirmative request he made was when he initially procured a policy through Hague's father, and, then, his request was for "adequate" insurance. As the court in *Jones* explained, "an insured's request for 'sufficient coverage' and an agent's assurance that the policy provided 'adequate' coverage do not, in and by themselves, imply an 'expanded principal-agent relationship.' Such an exchange usually occurs within the context of the general principal-agent relationship. 'Purchasers of insurance generally seek "sufficient coverage." [Citation.] To imply the existence of a broader agency agreement from such an exchange, . . . would in effect make the agent 'a blanket insurer for his principal.' " (*Jones, supra,* 189 Cal.App.3d at p. 956; see *Wallman, supra*, 200 Cal.App.4th at pp. 1310–1311 [no negligent failure to procure agreed-upon coverage where, "by plaintiffs' own admissions their statements to the [insurance agent] about the kind of coverage they wanted were extremely general in nature"].)

That Hague assertedly told him years later " 'the cost would go up because it had been built into the policy . . . due to construction costs and the market going up, those limits would go up,' " is not an assurance of, or a response to a request for, any particular type coverage or any specific level of

18

coverage, and certainly is not an assurance of, or a response to a request for, " '100% replacement cost' coverage." (See *Fitzpatrick, supra,* 57 Cal.App.4th at pp. 928–929.) Indeed, Worden admitted he never made any specific request as to the type or extent of coverage provided by the policy.

In sum, none of the proffered evidence suggests Hague held himself out as being anything other than a general insurance agent. (See *Fitzpatrick, supra,* 57 Cal.App.4th at pp. 927–928 [agent who did business with insureds for 20 years, knew "generally" insureds wanted "the upper limits of coverage," and "several times" told insureds coverage was "adequate," did not assume special duty].) Indeed, Hague declared that he was "not a licensed contractor," an appraiser, or "a risk manager or financial adviser," that he had "never built or remodeled any homes," that he did not receive any consulting fees for the services provided to his customers, and that he was "not an expert in the cost of rebuilding in Sea Ranch." Worden submitted no evidence to the contrary.

The trial court therefore correctly concluded the general rule applies here and defendants owed no special duty to assure that Worden carried full replacement cost coverage.

### Negligent Misrepresentation

Negligence and negligent misrepresentation are different torts with different elements. (*Bock v. Hansen* (2014) 225 Cal.App.4th 215, 227–228.) But it "is true that, as in negligence, 'responsibility for negligent misrepresentation rests upon the existence of a legal duty, imposed by contract, statute or otherwise, owed by a defendant to an injured person. [Citation.] The determination of whether a legal duty exists is primarily a question of law.' " (*Id.* at p. 228.) "It is generally said that ' . . . California courts have recognized a cause of action for negligent misrepresentation, i.e.,

19

a duty to communicate accurate information, in two circumstances. The first situation arises where providing false information poses a risk of and results in physical harm to person or property. The second situation arises where information is conveyed in a commercial setting for a business purpose.' " (*Id.* at p. 229.)

Negligent misrepresentation consists of a " '[m]isrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and resulting damage.' " (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 983.)

Worden's misrepresentation claim fails for essentially the same reason his negligence claim fails. He alleged that Hague "represented to Worden that he would obtain adequate insurance coverage" for the Sea Ranch home, and he testified at his deposition to the same effect. Worden construes Hague's representation to mean that Hague would obtain full replacement cost coverage for Worden. As the cases discussed in the preceding section make clear, a request for, or assurance of "adequate" coverage is *not* the same as a request for, or assurance of, " '100% replacement cost' coverage.' " (See *Fitzpatrick, supra,* 57 Cal.App.4th at pp. 921–930.) Accordingly, Worden cannot predicate a claim that Hague "misrepresented" that Worden had full replacement cost coverage on Hague's asserted statement that Worden had "adequate" coverage. Thus, as the trial court ruled, Worden failed to allege, or adduce evidence of, any "misrepresentation" by Hague.

In addition, given the repeated warnings in the annual renewal packets about the peril of being underinsured and specific recommendations as to how to avoid this calamity—none of which Worden heeded—Worden also

20

could not have reasonably relied on Hague's vague statement of "adequate" coverage as assurance that Worden was covered for the full cost of replacing the home. Indeed, as we have discussed, the "California Residential Property Insurance Disclosure" notice specifically listed the "Primary Forms" of dwelling coverage, including "Guaranteed Replacement Cost," and also made clear Worden did *not* have this coverage (as did the Policy Notice concerning dwelling reconstruction costs). These same notices further warned about being underinsured, and recommended insureds obtain a current estimate to rebuild based on costs in the area in which the property is located. In short, what an insured could not reasonably do—in the face of notice about the various levels of coverage, notice that the insured did not carry full replacement cost coverage, and multiple warnings about and recommendations to avoid being underinsured—was simply "assume," as Worden admittedly did, that coverage purchased in 1972 would provide " '100% replacement cost' coverage' " four decades later.[12] Worden's negligent misrepresentation claim therefore fails for lack of reasonable reliance, as well.

## DISPOSITION

The judgment is affirmed. Defendants to recover costs.

---

[12] The two cases Worden cites for the proposition he was not required to review the policy and could rely on defendants' representations are entirely distinguishable, as here, in contrast to those cases, defendants made no misrepresentations about the scope of Worden's coverage. (*Butcher v. Truck Ins. Exchange* (2000) 77 Cal.App.4th 1442, 1446 [agent misled insured into believing new policy included malicious prosecution injury coverage]; *Clement v. Smith* (1993) 16 Cal.App.4th 39, 42–43 [agent orally misinformed insured policy would cover litigation by a specific person].)

_____

           Banke, J.

We concur:

_____

Margulies, Acting P.J.

_____

Sanchez, J.

A156876, Worden v. Farmers Fire Insurance Exchange et al.